```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IN RE SEPTEMBER 11 PROPERTY DAMAGE          :    21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION                :
------------------------------------------------------------------x
CONSOLIDATED EDISON COMPANY OF              :
NEW YORK, INC., and;                        :
AEGIS INSURANCE SERVICES, INC.,             :
LIBERTY INTERNATIONAL UNDERWRITERS, INC.,   :
NATIONAL UNION INSURANCE COMPANY            :    07 Civ. 7968 (AKH)
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE   :
LIMITED and CERTAIN UNDERWRITERS AT LLOYDS  :
(SYNDICATE 1225), all as subrogees of CONSOLIDATED :
EDISON COMPANY OF NEW YORK, INC.            :
                                            :
                         Plaintiffs,        :
                                            :
         - against-                         :
                                            :
7 WORLD TRADE COMPANY, L.P., 7 WORLD TRADE  :
COMPANY, L.P. d/b/a 7 WORLD TRADE CENTER    :
COMPANY, SILVERSTEIN DEVELOPMENT CORP.      :
and SILVERSTEIN PROPERTIES INC.             :
                                            :
                         Defendants.        :
------------------------------------------------------------------x
```

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO SILVERSTEIN MOTION TO DISMISS

Gennet, Kallmann, Antin & Robinson, P.C.
Attorneys for Plaintiffs
45 Broadway Atrium
Litman Suite
New York, New York 10006
(212) 406-1919

Mark L. Antin (MA0427)
On the Brief

Greenbaum, Rowe, Smith & Davis, LLP
Attorneys for Plaintiffs
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
(732) 549-5600

Franklin M. Sachs (FS 6036)
On the Brief

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4-6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6-10

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    PLAINTIFFS' COMPLAINT SEEKS INDEMNITY FOR
    DAMAGES ARISING OUT OF OR IN CONNECTION WITH
    THE PRE-CONSTRUCTION AND CONSTRUCTION
    ACTIVITIES OF SILVERSTEIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11-14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

# TABLE OF AUTHORITIES

**PAGE**

**CASES:**

*Mastrobuono v. Shearson Lehman Hutton, Inc.*
514 U.S. 52, 115 S.Ct. 1212, (1995).................................................................. 12

*Furia v. Furia*
116 A.D.2d 694, 498 N.Y.S.2d 12 (2nd Dep't 1986...................................... 11

*Thomas Crimmins Contracting Co., Inc. v. City of New York*
74 N.Y.2d 166, 542 N.E.2d 1097 (1989)........................................................ 12

*219 Broadway Corp. v. Alexander's, Inc.*
46 N.Y.2d 506, 387 N.E.2d 1205 (1979)........................................................ 11

**PRELIMINARY STATEMENT**

Plaintiffs Consolidated Edison Company of New York, Inc. and its subrogating insurers (collectively "Con Edison") respectfully submit this brief in opposition to the Motion to Dismiss of defendants 7 World Trade Company, L.P., 7 World Trade Company, L.P. d/b/a 7 World Trade Center Company, Silverstein Development Corp, and Silverstein Properties Inc. (collectively "Silverstein").

Stripped of its diatribe as to why Con Edison did not file its contract complaint against the defendants until September 11, 2007, the defendants' Memorandum of Law in Support of their 12(b)(6) Motion to Dismiss is an unsupported, and unsupportable, argument for the narrowest possible reading of the Consent Agreement between Con Edison and Silverstein. The terms of the agreement compel a much broader reading. The timing of the filing of the complaint is immaterial. It has no impact upon ongoing discovery.

Silverstein's legal argument is devoid of any legal authority to support defendants' unduly narrow reading. The black letter authority cited for general propositions regarding contract construction set forth on page 5 do not provide any support. Thus, deconstruction of Silverstein's diatribe concerning the timing of Con Edison's contract complaint sets the foundation for the collapse of their entire argument.

As the record reflects, Con Edison's file regarding the construction of the office tower "in, on or about" its substation has been missing since before the inception of this litigation. Because this was not a construction file for work done by Con Edison, it was likely destroyed in the years after 1986 during internal changes in the engineering department within Con Edison. Thus, as stated to this Court in the affidavit of Franklin M. Sachs dated July 20, 2006 (Exhibit "A" to the Antin

Declaration), and in oral argument on August 9, 2006, (Exhibit "B" to the Antin Declaration, at p. 5), the first time after September 11, 2001 that current Con Ed employees and attorneys could possibly have had eyes on the 1982 Consent Agreement was when it was produced in document production in this litigation– sometime in the late spring of 2006.

Depositions concerning the Consent Agreement and other agreements between and among the parties have not been completed. Plaintiffs deferred filing the present complaint until six years from the events of September 11, 2001, not because they had a sudden "epiphany", as Silverstein snidely puts it, but because it was prudent to determine whether ongoing discovery would cast any additional light on the language of the agreement and the surrounding circumstances. This Court has previously asked for the development of a fuller record regarding other contract interpretation issues in connection with the Citigroup motions decided in 2006, and plaintiffs elected to conduct as much "expedited track" discovery as possible before filing their contract complaint.

The defendants' argument for dismissal of the complaint is predicated solely on their rather tortured construction of the Agreement whereby they read into the language a temporal constriction of the broad indemnification language in Sec. 16 to risks occurring only during the actual period of pre-construction and construction. They overlook or ignore the agreement's language regarding risks that "arise from" the design and construction - risks which only became evident after the construction was completed. Such a constricted reading of the language of Sec. 16 (a) makes no sense when viewed in the context of the entire Consent Agreement itself and in the broader context of the lease between Con Edison and the Port Authority, and the Ground Lease between the Port Authority and Silverstein.

Silverstein's narrow reading of the agreement continues with its efforts to constrict the applicability of the indemnification geographically to substation work only, but not to work involving the office tower on or about the substation. This makes no sense because the proposed office tower was to be much larger than originally contemplated by the Port Authority, potentially creating greater risks to the substation. Moreover, it makes no sense for Con Edison to have required indemnification for damage caused by design and construction involving foundation work in and around the substation, but not indemnification for damage caused by the design and construction work of the office tower itself.

## STATEMENT OF FACTS

### The Predicate Agreements

The Consent Agreement (Exhibit "A" to Wang Declaration attached to moving papers) between Con Edison and Silverstein evolved from two earlier agreements. The first, the 1968 lease between Con Edison and the Port Authority (Exhibit "C" to the Antin Declaration), led to the construction of the Con Edison substation. The second, the 1980 ground lease between the Port Authority and Silverstein (excerpts attached as Exhibit "D" to the Antin Declaration), led to the construction of 7 World Trade Center on and about the substation. The provisions of the Consent Agreement which form the basis for plaintiffs' contract claim cannot be fully understood without reference to certain provisions of the two agreements which preceded it.

Provisions of the 1968 lease which have previously come under scrutiny by this Court include Sections 8, 15, 16, 17, and a provision which has not yet received the attention it warrants, Section 40 (b). *(See, e.g.*, the brief of the Citigroup defendants in support of their motion for summary judgment dated November 23, 2004, and the brief of Con Edison in opposition to that

motion dated January 26, 2005, annexed to the accompanying Antin Declaration as Exhibits "E" and "F," respectively).

Section 8(a) of the 1968 lease contemplated construction by the Port Authority of an air rights building upon the substation which would be built on the site: "the Port Authority may construct wholly or partially **on, above or about** the Substation. . .". To allow for this construction, the lease permitted the Port Authority to enter the substation and use certain parts of it to perform construction related to the building to be constructed on, above or about the substation:

> [T]he Port Authority in performing such additional construction may . . . temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction.

Con Edison remains committed to the position that Section 8 limited the damages Con Ed might recover due to the Port's exercise of Section 8 rights, to the period of construction.

Section 16 of the 1968 lease, on the other hand, provided for indemnity to Con Edison for damage to the substation building and the Con Edison equipment therein caused by:

> the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof.

There is no temporal limitation on this indemnity provision. Its language clearly reflects the Port's liability for damage caused by the construction or maintenance of the building whenever that damage might occur. The Port Authority's liability to Con Edison under this lease provision does not require fault or negligence.

Another lease provision, Sec. 40 (b), specifically recognizes the Port Authority's liability where there has been damage to Con Edison's property due to the negligence of the Port Authority,

7

its employees or agents. That provision makes clear that the Port Authority's liability for negligence is distinct from its without negligence or fault "acts or omissions" liability under Sec. 16 of the lease ("...provided, however, that nothing in the paragraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof."). The remedies available to Con Edison under this section are not restricted to damage to the substation building or the equipment located therein. At the time of construction of the substation and in anticipation of future construction of 7 World Trade Center, caissons, columns and other foundation structures were installed in and around the substation to accommodate the structure the Port Authority contemplated it would eventually build above the substation.

**A Change in Plans: The Ground Lease and the Consent Agreement**

By 1980 or so, the Port Authority decided that it would not be the developer of the building above the substation. Instead, it solicited bids from developers to whom it would lease the property and who would construct and operate the building. The 1980 lease between the Port Authority and Silverstein implemented that decision. In doing so, the agreement recognized certain obligations and liabilities which the Port Authority had undertaken to Con Edison in the 1968 lease. The Port Authority incorporated provisions in the Silverstein lease to protect itself from liabilities which might arise to Con Edison from Silverstein's execution of the construction which the 1968 lease contemplated that the Port would perform.

The building which Silverstein chose to construct was much different than the building originally contemplated by the Port Authority. It was both taller and with a larger footprint. The overall square footage would be almost double the size of the one million square foot building originally contemplated. As a result, the caissons and other foundation structures installed at the

8

time of the construction of the substation were not adequate for Silverstein's enlarged project. Silverstein had to obtain Con Edison's approval for this different building, and this was recognized in Sec. 4.5 of the 1980 lease with the Port Authority:

> Section 4.   Development and Construction of Tower Building
>
> *       *       *
>
> 4.5     [Silverstein] within ninety (90) days from the Commencement Date shall prepare and submit to the Port Authority for its review and approval basic design schematic plans for the Tower Building, including but not limited to column locations, service core designs and general building service areas. The Tower Building depicted thereon shall not exceed or be incompatible with the weight, load bearing or other design or engineering characteristics of the Improvements except that [Silverstein] has advised the Port Authority that subject to obtaining the approval of Consolidated Edison [Silverstein] intends to erect a Tower Building in excess of one million rentable square feet and if the Tower Building depicted thereon is in excess of one million rentable square feet then the basic design schematics shall also show additional foundations and supports and the Tower Building depicted thereon shall not exceed or be incompatible with the weight, load bearing or other design, or engineering characteristics of the Improvements and [Silverstein's] additional foundations and supports.

Pre-construction activities leading to the construction of 7 World Trade Center necessarily included the structural design of the building in, on and about the Con Edison substation. On September 11, 2001, the events of that day led to a structural failure, the likes of which had not previously been seen for a building of this type. No Class 1A steel frame structure had previously suffered a global collapse due to fire. Inasmuch as such buildings are designed to withstand burn-out without total failure of its structural systems, the collapse of 7 World Trade Center has attracted the national attention of investigative governmental agencies and engineers, among others, who are intent upon determining what caused this unprecedented structural failure. Although investigation into the exact cause(s) of the collapse is ongoing, plaintiffs will demonstrate at trial that significant

contributing factors were the design "tricks" which had to be used by Mr. Silverstein's structural engineers to overcome existing conditions and enable his ambitious plan:

> "'we had to do design tricks to accommodate the existing Con Ed facility, said Mr. Cantor, the structural engineer. 'This building had an awful lot of transfers.'"

Ex. 2 from deposition of Carl Borsari, February 22, 2008.

Additional factors of safety necessitated by their "tricks" were not made part of the structure's design, creating an unduly vulnerable building.

The operative provisions of the Consent Agreement have, with a few exceptions noted herein, been presented to the Court in Silverstein's motion. However, among those not presented is Sec. 14, the insurance and indemnity provision:

**Section 14.    CONTRACTORS AND SUBCONTRACTORS INSURANCE: INDEMNITY**

(a) Contractor shall carry or cause to be carried Workmen's Compensation and Comprehensive General Liability Insurance, which includes the coverage for the completed operations, explosion, collapse and underground hazards with broad form contractual endorsement for written or oral contracts and cross liability, in which Con Edison is named as an insured. Coverage shall be obtained to indemnify and protect Con Edison from all insurable risks and from all claims and suits for bodily injury or property damage including those made or brought by Con Edison or its customers which are **attributable to the Work.** The policies shall provide for 30 days prior notice of cancellation for any reason to Con Edison. The limit of coverage for any single accident or occurrence shall be no less than $50,000,000. [emphasis added]

This provision protects Con Edison from its own property damage losses "attributable to the Work." As discussed in further detail in the argument below, Con Edison will show that the collapse of the building and the destruction of the substation were attributable to the pre-construction and construction structural design Work.

10

## ARGUMENT

### PLAINTIFFS' COMPLAINT SEEKS INDEMNITY FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE PRE-CONSTRUCTION AND CONSTRUCTION ACTIVITIES OF SILVERSTEIN

In the contract complaint which is the subject of the Silverstein motion to dismiss, plaintiffs specifically allege that the structural design of 7 World Trade Center led to the collapse of the building and Con Ed's damages (Complaint,¶ 31). Silverstein's assertion to the contrary simply misstates what the complaint alleges. It is not incumbent upon the plaintiffs, at least at this point, to plead or show exactly how Silverstein's pre-construction design activities contributed to the collapse of the building or the precise manner in which the building was improperly designed and constructed – that is the burden of proof at trial. A complaint at this stage of the litigation is accepted to be true as to each and every allegation therein. *219 Broadway Corp. v. Alexander's, Inc.,* 46 N.Y.2d 506, 387 N.E.2d 1205 (1979). Thus, to withstand a motion to dismiss, a breach of contract complaint need only allege the terms of the agreement and the basis of the alleged breach of the agreement. *See, Furia v. Furia,* 116 A.D.2d 694, 498 N.Y.S.2d 12 (2nd Dep't 1986). Such has been properly alleged.

The Court's January 12, 2006 decision gave more credence to a reading of Sec. 8 of the 1968 lease as being applicable beyond the period of construction than argued by plaintiffs. However, if the language of Sec. 8 can be read as having applicability beyond the period of construction, then surely the language of Sec. 16 of the Consent Agreement requires as broad a reading.

The general principles of contract interpretation set out by Silverstein are not disputed. Silverstein has misapplied them. Inarguably, structural design is a pre-construction or construction activity. However, says Silverstein, the agreement should only be read to apply to such work in and

11

under the substation, but not "on" and "about" the substation. Silverstein's construction – or misconstruction by omission – of these words has flaws which bring down its entire argument, just as its flawed design and construction brought down the entire building.

It is well settled that a contract must be construed to give meaning to all of its terms, if possible. That rule is a "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212 (1995), citing *Thomas Crimmins Contracting Co., Inc. v. City of New York*, 74 N.Y.2d 166, 542 N.E.2d 1097 (1989).

Here, Silverstein urges a construction of the contract which would ignore some of its terms. For example, par. 2 (a) of the agreement encompasses a scope of the permitted Work more broadly then does Silverstein in its motion:

> further Work, including any of the design drawings, plans and specifications for the **office tower** under Section 4 of [Con Edison's] lease with the Port and any design drawings, plans and specifications for construction of a certain **pedestrian bridge** under the supervision of the New York City Public Development Corporation. [emphasis added]

The office tower located upon the substation is clearly within the ambit of the Consent Agreement, and Silverstein's insistence otherwise is contrary to the unambiguous language of the document.

Silverstein's effort to temporally constrict the Consent Agreement's language is based upon selective reference to, and undue repetition of, the obvious fact that the agreement provides Silverstein access to the substation. From this, Silverstein erroneously concludes that the document is nothing more than a work access permit. Plaintiffs acknowledge that the Consent Agreement transfers to Silverstein the access which had previously been granted to the Port Authority in the 1968 lease. However, it does more. Silverstein's access to the substation was conditioned upon

certain contractual protections, including indemnity for damages "arising out of or in connection with performance of the Work", not just during the Work. As stated, plaintiffs have alleged in their complaint, and will show, that the collapse of WTC 7 on September 11, 2001 arose out of the performance of Silverstein's pre-construction design activities.

It is clear, therefore, that the consent which Silverstein obtained from Con Edison to proceed with the construction of the larger than anticipated tower included much more than just permission to access and perform work in the substation. The specific work for which Silverstein requested access was integral to the construction of the entire building.

Read properly, the indemnity provision in the Consent Agreement applied to the consequences of all pre-construction activities including the structural design activities which led to the collapse years later. Nothing in the agreement suggests that if a latent defect in the design of the building was triggered by a subsequent event– an earthquake, a windstorm, an explosion or fire– 6 months, 6 years or any other time in the future, Silverstein would not be required to indemnify Con Edison under the terms of the Consent Agreement. For example, had damage to the substation occurred at any time after construction because the load of the office tower was greater than could be sustained by caissons added to accommodate the larger Silverstein building, the indemnity provisions of the Consent Agreement are clearly triggered. The present matter is not materially different. A latent design defect in the structure built "on" the substation "arising out of and in connection with" the Silverstein construction caused the damage, triggering indemnification under Sec. 16 (a) (2).

If the parties to the Consent Agreement intended to limit its scope to activities occurring before or during construction within the substation or even during the construction of the office tower, they could have used words to that effect. No such limiting language appears. Yet at page 10 of the Silverstein memorandum of law in support of its motion, Silverstein uses the term – "during" to suggest a temporal limitation to the indemnification obligation not present in the agreement itself. This example of Silverstein's tortuous efforts to wrestle the terms of the agreement to fit its argument contravenes the principles of contract construction upon which Silverstein relies.

And, finally, we note that the insurance and indemnification provisions of Section 14 of the Consent Agreement reinforce Con Edison's interpretation of the document. Indemnity is clearly provided for Con Edison's own property damage claims "attributable to the Work." This is a far broader scope of indemnity than argued for by Silverstein. If plaintiffs can show that the collapse of the building and destruction of the sub-station were attributable to the structural design of the building, the insurance provisions of the agreement should operate to indemnify Con Edison.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Silverstein motion to dismiss be denied.

Dated: March 18, 2008

>Respectfully submitted,
>
>*/s/ Mark L. Antin*
>MARK L. ANTIN (MA 0427)
>GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
>Attorneys for Plaintiffs
>45 Broadway
>30th Floor
>New York, New York 10006
>(212) 406-1919
>
>FRANKLIN M. SACHS (FS 6036)
>GREENBAUM, ROWE, SMITH & DAVIS, LLP
>Attorneys for Plaintiffs
>Metro Corporate Campus One
>P.O. Box 5600
>Woodbridge, New Jersey 07095-0988
>(732) 549-5600