# EXHIBIT B

```
                                689J911M                                     1
         689J911M              Motions
   1     UNITED STATES DISTRICT COURT
   1     SOUTHERN DISTRICT OF NEW YORK
   2     ------------------------------x
   2
   3     IN RE: September 11th Property
   3     Damage and Business Loss Litigation    21 MC 101 AKH
   4
   4     ------------------------------x
   5
   6
   7
   8                                             August 9, 2006
   8                                             2:15 p.m.
   9
  10
  11
  12     Before:
  12
  13                     HON. ALVIN K. HELLERSTEIN,
  13
  14                                             District Judge
  14
  15
  15
  16
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                             2
         689J911M              Motions
   1              (In open court)
   2              (Case called)
   3              THE COURT:  I've allowed the interests of justice and
   4     the full presentation of an account to outweigh whatever
   5     argument of finality should attach to my rulings of December.
   6              Now the question is what is the substantive rule and
   7     how do you go about exploring it?
   8              Let me give you a few of my initial musings to set the
   9     stage.  The consent agreement attached to Con Edison's
  10     papers -- and for this purpose I don't distinguish between Con
  11     Edison and its insurers -- is entitled a consent agreement,
  12     more fully "Company consent to work premises, Trade Center
  13     Substation Manhattan, New York."
  14              It is revised as of March 24, 1982, and it seems to me
  15     to implement the various clauses in the agreement between Con
  16     Edison and the Port Authority which created the foundation for
  17     the development of the Port Authority.  The Con Ed substation
  18     was going to be the source of the electrical power that was
  19     fundamental to the operation of the complex.  Con Ed was more
  20     than happy to provide that power, and Con Ed also saw to it
  21     that it had to have various protections so that the substation
  22     could remain a substation of integrity while all the complex
                                    Page 1
```

```
                           689J911M
        23   building was going on around it.
        24           So exercising the clauses of the contract with the
        25   Port Authority, Silverstein proffered the various details of
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

                                                                              3
```
             689J911M                 Motions
         1   its design to the Con Edison engineers who reviewed it so that
         2   Con Edison could develop an independent base for evaluating the
         3   work and assuring itself that its property would not be in
         4   danger, its property and its business would not be in danger.
         5           I think that is a more or less neutral account of what
         6   happened. I held that there was a duty between the owners and
         7   managers of the Port Authority to Con Edison so absent whatever
         8   may come out of the further exploration of the agreements
         9   between -- the question is, is the recourse of Con Edison
        10   against only those owners and managers, that is, against the
        11   Port Authority and Silverstein, not taking into account now
        12   whatever particular clauses there may be in those
        13   relationships, or is there a relationship sufficiently akin
        14   between those of the design and construction contractors that
        15   were involved in this series of meetings with Con Edison that
        16   also creates a duty to Con Edison.
        17           The few cases in this area which all of us have parsed
        18   don't really help. This is really a new area under New York
        19   law. It is surprisingly so, but it does seem to be so. So how
        20   do you go about it? What do we do? How do you explore the
        21   issue? I don't think I want to cut this off. I want this at
        22   least: Ultimately, I'll have to issue a decision. My decision
        23   will be better informed if I allow a fuller record to be
        24   developed, but what kind of a fuller record?
        25           Do I subject this issue to the overall issues or do I
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

                                                                              4
```
             689J911M                 Motions
         1   take it apart? Can we have some kind of faster track for it?
         2   Is the discovery boundless or can it be fairly limited? What
         3   are really the propositions of law that drive this?
         4           A few more musings. If Con Ed looked at this design,
         5   and I assume the design showed the fuel tanks that went into
         6   the Solomon floors --
         7           MR. SACHS: Not at this stage. This is 1982 we are
         8   talking about. Those fuel tanks didn't go in until the late
         9   80's.
        10           THE COURT: So the designs were just of the building
        11   itself?
        12           MR. SACHS: That's correct, sir.
        13           MR. MALONEY: Do we know that it was in 1982?
        14           THE COURT: Let's use a more formal format. You have
        15   to address me, and we'll get this thing.
        16           MR. SACHS: I am sorry, sir.
        17           THE COURT: Let's go into this. Go ahead.
        18           MR. SACHS: The consent agreement to which your Honor
        19   refers is dated 1982. The affidavit of Mr. King refers to
        20   meetings that took place at the initial construction of World
        21   Trade Center 7 atop the Con Ed substation.
        22           It is during those times that there were meetings on a
        23   weekly or bi-weekly basis, according to Mr. King, among
        24   Mr. Silverstein, Mr. Cantor and Mr. Roth, together with two Con
        25   Ed representatives and representatives from the Port Authority
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
                                   Page 2
```

```
                          689J911M                                    5
     689J911M                  Motions
1    at various times.
2              That building was completed at some point.  The
3    modification to the building to include the standby generating
4    system or what was then Salomon Brothers was introduced, I
5    believe, in 1988.
6              THE COURT:  Is there any evidence of Con Edison being
7    involved in that time?
8              MR. SACHS:  No, sir.
9              THE COURT:  None?
10             MR. SACHS:  Not that I know of.  You have to
11   understand, your Honor, we have not even been able yet to find
12   the file that contains this consent agreement, and the reason
13   for that is simply that Con Ed totally restructured their
14   engineering department, so I don't have any of the documents
15   relating to those issues except what has been produced by other
16   people.  So all I can tell you is what I know as I stand here
17   today.
18             THE COURT:  What happened to Con Ed's files?
19             MR. SACHS:  I wish I knew, sir.  All I can tell you is
20   this --
21             THE COURT:  Did they go up in flames?
22             MR. SACHS:  No, no.  I can tell you what happened is
23   that in the late 80's or early 90's Con Ed changed his whole
24   engineering department.  I have tried to track down where they
25   moved to, where those files went to.  I have been to -- I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                      6
     689J911M                  Motions
1    haven't been to, but I have had people go to various locations
2    to try to find those files.  To date, sir, I have not been able
3    to find them.
4              We are continuing to have people look and are
5    continuing an investigation.  I believe they will be found
6    because there is no reason that they shouldn't be, but I do not
7    know where they are now and I do not have them right now.
8              THE COURT:  What makes you think they'll be found?
9              MR. SACHS:  Continuing effort and just my belief that
10   they are somewhere that nobody has yet figured out in some
11   archive some place.  I may be wrong.  That is just my hope.
12             Now, many of these things, your Honor, if I may, many
13   of these things, there are memoranda of meetings that I
14   suspect -- maybe if I'm lucky, Mr. Cantor, Mr. Cantor may have,
15   Mr. Silverstein may have, Port Authority may not because some
16   of their records certainly were destroyed in the destruction of
17   World Trade Center I, but I believe there are going to be a lot
18   of records with respect to what took place during these
19   meetings.  I just don't happen to have them.
20             THE COURT:  How do you propose to go about obtaining
21   them?
22             MR. SACHS:  Well, if I may, if I may ask the court, it
23   really depends for what purpose?
24             If the purpose is, as the court has come out and
25   suggested, to go into more deeply the relationships among the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                      7
     689J911M                  Motions
1    parties for the purposes of determining what kind of
2    relationships existed and whether that should give rise to a
3    duty, and we are not dealing solely with a 12 (b)(6) motion, I
```

Page 3

```
                          689J911M
       4    think we first have to determine, as your Honor suggested, what
       5    standard is going to apply. This whole idea of a special
       6    relationship, as your Honor pointed out, I agree, the cases are
       7    not terribly helpful, although there are some guidelines.
       8            I have some thoughts for the court and to discuss with
       9    the court as to what might be those standards, and then once we
      10    would decide what those standards may be, that would certainly
      11    help in determining what kind of discovery might be necessary
      12    to determine whether those standards were met.
      13            THE COURT:   What is your suggestion?
      14            MR. SACHS:   May I, may I suggest to the court first --
      15    and this is just prophylactic for me -- your Honor, of course,
      16    understands that we don't believe as a legal matter that
      17    privity or the functional equivalent of privity is necessary.
      18            I understand that is your decision and that is the
      19    decision we are operating under, and so my suggestions go to
      20    that decision and to the language you used in that decision and
      21    not to whether or not that standard is the legal standard that
      22    should apply.
      23            THE COURT:   You'll save the broadest scope for the
      24    court of appeals.
      25            MR. SACHS:   Or if your Honor sometime would like to
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                          8
```
            689J911M               Motions
       1    hear more on the subject.
       2            THE COURT:   No. I think I've resolved that matter.
       3            MR. SACHS:   Okay. The only place we find any guidance
       4    at all, it seems -- and it is the guidance that your Honor
       5    suggested -- was in the Ossining case, and it was the
       6    three-pronged test contained in Ossining.
       7            I would like to, I would like to discuss those three
       8    prongs because I think with some modification, they might
       9    served as some basis for determining whether a sufficient
      10    special relationship exists. In now Chief Judge Kay's opinion
      11    and her review on the law on the question of whether privity or
      12    the functional equivalent of privity is required of a plaintiff
      13    to state a cause of action, she was dealing with negligent
      14    misrepresentation cases, which is not what we're dealing with
      15    here, and she was dealing with a case where only, the only
      16    damage is economic.
      17            She makes clear that the entire concern of the Court
      18    of Appeals in those cases is that in negligent missrep cases,
      19    whether they be the accountants in Ultramaries, whether they be
      20    the engineers or the weighers in Gallons --
      21            THE COURT:   Lancer against Shepard?
      22            MR. SACHS:   Right or whether they be the engineers in
      23    Ossining, her entire concern in those cases is what is an
      24    objectively foreseeable injury may be vast and unbounded,
      25    wholly disproportionate to a defendant's undertaking or
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```
                                                                          9
```
            689J911M               Motions
       1    wrongdoing.
       2            THE COURT:   I think Mr. Maloney will be very quick to
       3    point out that the illustration of that concern is this case.
       4    The outcome was a terrorist-related collapse of the building,
       5    not even primarily as the consequence of the impact into I and
       6    II, but secondarily, from the incredible burning of I and II.
       7            MR. SACHS:   With due respect, your Honor, we are not
       8    suing the terrorists here.
                                     Page 4
```

689J911M

9  THE COURT: I know you are not. You are suing the
10 design professionals.
11  MR. SACHS: We are suing because a fire occurred. I
12 don't think it matters, your Honor, how that fire occurred for
13 the purposes of what we are doing here.
14  THE COURT: You are not going to persuade me on that
15 point. This is one of the concerns I have.
16  Your focus of persuasion, and I am limiting it,
17 anything else you have to do by way of appeal at the end of the
18 case, your focus of persuasion is whatever a relationship was
19 created or the functional equivalent of such relationship
20 between those who you are suing and Con Edison.
21  MR. SACHS: That is what I am directing my comments
22 to.
23  THE COURT: You must direct it to that because
24 otherwise we'll pass you. That is why I am potentially
25 reopening the case, just for that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

689J911M          Motions
1   You persuaded me that the meetings that occurred in
2  1982 concerning the overall building showed that, potentially
3  showed that kind of relationship. It may have been focused
4  only on the issue of consent, in which case the defense may
5  shift from absence of duty to assumption of risk, or it may
6  have presaged a continuing relationship that dealt with the
7  changes in design or improvements in design or modifications of
8  the design of the building or its contents in the years that
9  followed. That is why I am opening it. That is why I am
10 potentially allowing discovery.
11  MR. SACHS: I understand, sir.
12  THE COURT: But I want the discovery limited.
13  MR. SACHS: I understand, and I think what I am going
14 to suggest is going to limit it very much.
15  I believe the cases that Chief Judge Kay was referring
16 to all dealt with the problem of the ambit of duty, the zone of
17 danger, the scope of liability in a case where there is no
18 physical damage; in other words, there is just economic damages
19 and in a case of negligent misrepresentation.
20  And so the tests that were devised or that were set
21 forth by Chief Judge Kay in Ossining have to be looked at and
22 have to be viewed with that fact in mind, and it is in viewing
23 those tests and suggesting how we might proceed to do what your
24 Honor is asking that I intend to move.
25  Test No. 1, as both noted by the court and by Chief

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

689J911M          Motions
1  Judge Kay said the defendant must be aware that its work would
2  be used for a particular purpose.
3   Well, it seems to me, your Honor, the only reason for
4  Test No. 1 is to limit the exposure in economic damages cases;
5  and, therefore, the purpose of that test is to limit it to a
6  known purpose.
7   For example, let's take Ultramaries for one. There we
8  know that the exposure could be endless. Once an accountant
9  signs and audited statement, it could go on forever. The rule
10 was or this test was devised that it should be for a
11 particular, a known, a known plaintiff and for a particular
12 purpose.
13  Here it seems to me there isn't going to be much

Page 5

689J911M

14 question that the known plaintiff here is Con Edison upon whose
15 building this new office tower is designed and is going to be
16 constructed, and so I think the first area that would form the
17 basis for the test is essentially whether the design
18 professionals knew or reasonably should have known that this
19 particular plaintiff, Con Ed, the owner of the building, would
20 rely upon the design professionals to design a building or fuel
21 system that would not lead to the collapse of the building upon
22 Con Ed's substation.
23         In other words, a particularly known party, because
24 they're the one that you're using for the foundation, did they
25 understand that and did they act knowing that they had a duty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

689J911M                    Motions
1 to protect that foundation in their design.
2         Test No. 2.
3         MR. SCHRENKINGER: Your Honor, before he continues,
4 may I say something? I represent the Cantor defendants.
5         THE COURT: Let him finish.
6         MR. SCHRENKINGER: Okay.
7         MR. SACHS: Test No. 2.
8         THE COURT: The people who appointed me felt that I
9 could remember an argument for 15 minutes or so till the next
10 one came up. Now, it is a more risky proposition as the years
11 go by, but I think I'm all right so far.
12         MR. SACHS: Test No. 2, your Honor. I have that same
13 "years go by" problem.
14         Test No. 2 says reliance by a known party. Again,
15 here there is no question about the party. We know in the
16 negligent misrep cases and income damages cases, 532 Madison
17 Avenue case, there are hundreds and thousands of parties who
18 nobody knew and didn't know at the time the action took place.
19         Here at the time of this design, the meetings with
20 Cantor, the meetings with Emery Roth, et cetera, the scope of
21 the potential for liability and the potential for damage is
22 actually very narrow when we look at Con Edison. They were
23 discussing with Con Edison the steps that had to be taken while
24 they built this building to protect the building, and I believe
25 that they will testify, if I ask Mr. Cantor or I ask

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

689J911M                    Motions
1 Mr. Silverstein or I ask Mr. Roth, that they knew very well
2 that Con Ed was relying upon them to design this in a safe
3 manner, and they did so or tried to do so when they were
4 building it.
5         This is not beyond what is a very narrow scope. We
6 are not talking about it going beyond the building that it is
7 on top of.
8         Test No. 3. Is the test that is called some conduct
9 by the defendants linking them to the party or parties and
10 evincing their understanding of the reliance of the known
11 party. Again here we have a situation in which we have design
12 professionals who are building a structure on top of another
13 structure. They consult with representatives of Con Ed. They
14 consult with their own people they contracted with, whether it
15 be Mr. Silverstein or whether it be Port Authority or whether
16 it be their subcontractors, and in all of that it is highly
17 likely that there were discussions as to how to protect this
18 substation and what their role and what their duty was and who

```
                        689J911M
19   was relying upon it.
20            Again I think those three tests, if applied as
21   modified -- in other words, when we realize what the purpose is
22   of those tests and what we're trying to find well lead us to
23   whether or not there is a special relationship.
24            We are dealing here with a duty of care in a
25   negligence case.  I understand, in reading this court's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    14
```
      689J911M                    Motions
 1   opinion, this court is talking about some kind of a special
 2   relationship.  I suggest I don't know that it has to be privity
 3   or akin to privity, and I think the court used different
 4   languages it went through.  It was clearly talking about a
 5   special relationship and clearly was referring, I think it was,
 6   referring to Ossining and the tests that were used by Ossining.
 7            I think those can be used by us in terms of trying to
 8   measure what is somewhat amorphous, an amorphous term what is a
 9   special relationship when you're talking about a lease entered
10   into by Con Ed with the Port Authority that contemplated
11   sometime in the future a rather large office building was going
12   to be built above it.
13            I don't think there is any question but that the
14   parties contemplated that the Port Authority was going to hire
15   design professionals.  It turned out it then leased it to
16   Silverstein who hired design professionals, but there were
17   going to be design professionals who were going to be building
18   this building, and these design professionals were going to owe
19   a duty to Con Ed just as the Port Authority would owe a duty to
20   Con Ed.  I don't think there is any question about that.
21            Let me get to the end of this because --
22            THE COURT:  I don't assume it.
23            MR. SACHS:  Let's see what discovery shows.
24            I suggest to the court that one possible way and one
25   rather short way to determine whether or not this is so would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    15
```
      689J911M                    Motions
 1   be to allow us to take a very limited deposition of Mr. Cantor,
 2   of Mr. Roth, of Mr. Silverstein, and ask them some very simple
 3   and very limited questions.  I am talking about extremely
 4   limited.
 5            THE COURT:  How long will it take you to find your
 6   files?
 7            MR. SACHS:  I have no idea.
 8            THE COURT:  A better question:  How long shall I give
 9   you to find your files?.
10            MR. SACHS:  Judge, I have no way to even answer that
11   question.
12            THE COURT:  Will, I can't have a time period without
13   end.  I think 60 days.  You've had time since the beginning of
14   this case.  The case was begun in 2002 and 2004.  So let's say
15   2004, you have had at least two years, and you have known about
16   the decision since December -- January, January 12, 2006 is
17   when I issued it.  So it is another six months.
18            MR. SACHS:  The first time I even knew that such a
19   file existed, your Honor, was in May of this year.  Believe me,
20   I have been trying desperately to find that file.  There are
21   other alternatives.
22            THE COURT:  Yes, there are other alternatives.  I
23   think I should give you a limited time to find papers.  After
                                Page 7
```

```
                        689J911M
24       that you'll have to get permission from me in order to use
25       them.  I think 60 days is a reasonable period of time.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    16
```
         689J911M                  Motions
 1                Let me hear from some of your adversaries.
 2                MR. SCHRENKINGER:  Your Honor, Steve Schrenkinger.  I
 3       represent the Cantor defendants.
 4                THE COURT:  Yes, Mr. Schrenkinger.
 5                MR. SCHRENKINGER:  First of all, going back to what
 6       Mr. Sachs was recently referring to and your questioning of Mr.
 7       Sachs about the fuel tanks, I think what we are losing here is
 8       sight of what the scope of this consent agreement entailed.
 9                This wasn't something where Con Ed had a relationship
10       with the engineers, where they were looking at the designs,
11       checking over the designs, consenting to designs.  This was
12       pretty much to make sure that the Con Edison substation wasn't
13       harmed during the course of construction.  They were doing
14       construction on top of the Con Edison's property, so Con Edison
15       was just looking out to make sure that there wasn't any damage
16       done during the course of that construction, and if there was
17       any damage that was done, they would be duly compensated.
18                THE COURT:  What is the implication of that?
19                MR. SCHRENKINGER:  We are not talking about something
20       that happened after-the-fact; we are not talking about
21       plaintiff's theory of the case, that this generating or fuel
22       tank allowed for a fire to continue uninterrupted.
23                THE COURT:  Suppose someone from Con Ed told someone
24       from Cantor, look, as long as you're with this building -- and
25       I want Silverstein to know this as well -- anything you do with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    17
```
         689J911M                  Motions
 1       these designs that raises the risk, I want to make sure you let
 2       us know so we can give consent.  Suppose someone said that and
 3       it was accepted by Cantor, and Cantor signed off of Salomon's
 4       plan to have generating in the building.
 5                MR. SCHRENKINGER:  First of all, we are losing sight
 6       of the fact also that Cantor was a structural engineer.
 7                THE COURT:  Answer my question.
 8                MR. SCHRENKINGER:  I don't think we have any evidence
 9       of that even being close to the case.  There might be now
10       because --
11                THE COURT:  One of the privileges of my rank is that I
12       can make up hypotheticals.  One of your obligations is to try
13       to answer them.
14                MR. SCHRENKINGER:  I still don't think that would
15       arise in this relationship.  Why wouldn't this hypothetical be
16       made by the plaintiff during opposition to the original motion?
17                THE COURT:  We are passed that.  Mr. Schrenkinger, we
18       are past that.  Don't reargue that which I just decided.  That
19       was only two days ago.
20                MR. SCHRENKINGER:  I know.
21                THE COURT:  Why don't you assume I knew what I was
22       doing.  Maybe I made a mistake, but I knew what I was doing.
23       What is the implication?
24                Now, we have got a problem not out of the original
25       design, no one is suing over the original design.  There is an
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    18

```
                              689J911M
         689J911M                Motions
  1  interesting ellipse in what Mr. Sachs is contending and what he
  2  brought out to me. There is something that happened several
  3  years afterwards, but he has shown enough to make me concerned
  4  that there is some kind of a continuing relationship and maybe
  5  obligation arose out of this series of meetings that is
  6  reflected and resulted in the consent agreement of 1982. I
  7  want to know about that. Before I sign off on this case, I
  8  want to know about that.
  9           MR. SCHRENKINGER: I understand. That will come out
 10  during the course of discovery.
 11           THE COURT: What should be the limit of discovery?
 12  What should be the scope of discovery?
 13           MR. SCHRENKINGER: That is something I was wrestling
 14  with, too: What should be the limited scope of discovery?
 15           What happens after 60 days he doesn't find these
 16  memos, these memoranda, and then there is a decision issued
 17  that there was no special relationship and then there is new
 18  discovery again a couple of months after where --
 19           THE COURT: Thank you very much, Mr. Schrenkinger.
 20  Mr. Maloney, can you help me?
 21           MR. MALONEY: I think your Honor's suggestion is
 22  sensible. Why don't we find out what these documents are, and
 23  once we have that, then we can deal with the next step, which
 24  is potentially scheduling minor discovery around those
 25  circumstances or figuring out if there is an alternative way to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    19
```
         689J911M                Motions
  1  get the information. The problem is we are in a vacuum. We
  2  don't know what was at these meetings or what happened. So I
  3  think the first thing is to see if there are records that exist
  4  that can answer that question. It is sensible to see if we get
  5  them.
  6           THE COURT: Do we know the identities of the design
  7  and construction people that focused on the Salomon plans?
  8           MR. MALONEY: Yes. We know that one of the people who
  9  focused Salomon in order to be sure that they were in an
 10  expedited process hired the same person who Silverstein had as
 11  the structural engineer for the building, which was --
 12           THE COURT: Cantor?
 13           MR. MALONEY: -- Cantor. He was this person for
 14  Salomon as well as for Silverstein, as well as for prior
 15  building to make sure they weren't doing anything to affect the
 16  integrity of the building.
 17           THE COURT: It seems to me everybody ought to do a
 18  double-check on the files for the next 60 days, and I mean the
 19  active involvement of the lawyers as well. I want a thorough
 20  review of the files. At the end of the 60 days, I want a
 21  supplementary production, a supplementary production of
 22  anything that comes up that has anything to do with the
 23  development of the designs, meetings that were involved with
 24  any representatives of Con Edison and communications back and
 25  forth. I want a broad scope of review.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    20
```
         689J911M                Motions
  1           Then I want production in the next 10 days after that
  2  along with logs that identify specifically satisfying the
  3  requirements of the local rules of any documents not produced
  4  but which fit the scope.
```

689J911M

5  Then it seems to me we ought to have another meeting
6  on discovery proposals. I want discovery proposals. I want
7  deposition proposals. I will consider it at that time whether
8  I should vacate my decision of January 12th, 2006 as it relates
9  to the people who were dismissed or whether there should be
10 further exploration of the issue. That is my proposal.
11         MR. SCHRENKINGER: Your Honor --
12         THE COURT: Mr. Maloney first.
13         MR. MALONEY: I think it is sensible. The only
14 mechanical question, to the extent you want everyone to produce
15 that, I take it Citigroup will undertake to look during the 60
16 days.
17         THE COURT: I think everyone, everyone should look
18 because if there were meetings, these are the kinds of meetings
19 that you need an assembly hall to fit everyone in. There are a
20 lot of people taking minutes of the meetings.
21         Ms. Jacob, do you want to say something?
22         MS. JACOB: Beth Jacob, representing the Port
23 Authority.
24         I am not revisiting the court's proposal just now we
25 look again for the next 60 days, although the Port Authority

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

689J911M                    Motions
1  has looked a number of times. I want to clarify we are, we are
2  talking about document production, not about necessarily
3  identifying individuals who might still be around.
4         THE COURT: Ms. Jacob, that should be my comment, too,
5  I should have included that.
6         MS. JACOB: We should.
7         THE COURT: We should, yes.
8         MS. JACOB: Our concern, and we have identified some,
9  we are talking about the Port Authority going back to talking
10 to people may have been around in the 1960's, not just the 80's
11 with respect to relationship between Port Authority and Con Ed.
12         The idea I want to present, which I assume we'll
13 discuss more when we reconvene in 60 or 80 or whatever days, is
14 that this now is not narrow focused discovery, at least not
15 with respect to most of the litigation. What we are talking
16 about now is discovery with respect to how the building was
17 constructed, whose responsibility, certainly with respect to
18 the relationship between Con Ed, Silverstein and the Port
19 Authority, and as we get into the late 80's, bringing in
20 Salomon. This is very much the crux of the case.
21         THE COURT: Let me narrow this. I take the point, Ms.
22 Jacob. It is a good point.
23         Mr. Sachs, in my interpretation, has a claim because
24 of two areas of risk. One is the Salomon system of generation
25 of independent power, to have a 24-hour-a-day, 7-day-a-week

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

689J911M                    Motions
1  trading floor. That is one measure of risk.
2         The second measure of risk has to do with the city and
3  its needs in any design that was involved with that. There are
4  two different issues.
5         Let me talk first about the Salomon issue. It seems
6  to me that the consent agreement of 1982 is not really what Mr.
7  Sachs has in mind. Con Ed signed off on that. It may not be a
8  problem with the duty would be trumped by assumption of risk,
9  it seems to me, unless things changed in some material way or

Page 10

689J911M

10  the construction was not according to design in some material
11  way, "material" meaning adding to risk.
12          What he has in mind is what happened in 1986 with the
13  Salomon focus. The question will arise what was Con Edison's
14  involvement with those who were involved in the creation of a
15  design and the implementation of a design? I think that is the
16  gravamen of this claim.
17          MR. SACHS: That is not totally accurate, your Honor.
18          I believe the gravamen of our claim, the second part
19  is true, the 1986 changes. We also are very much interested in
20  the original design of this building. This building was
21  designed in such a way as to -- it was designed with a
22  non-redundant transfer trust system that made the building
23  susceptible to collapse if that system was overheated and
24  destroyed or plasticized by a fire.
25          THE COURT: You probably saw this in the plans.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

689J911M                    Motions

1          MR. SACHS: Your Honor, there has never been a review
2  of any Con Ed plans or will there be any evidence that Con Ed
3  reviewed these plans with a structural engineer or anybody like
4  that or did anything anywhere near what an owner did or Port
5  Authority did.
6          THE COURT: I can't narrow it the way you did.
7          MR. SACHS: It wouldn't narrow, your Honor.
8          THE COURT: Ms. Jacob's point is accurate. The burden
9  on creating is a significant burden. I don't know what to do,
10  Ms. Jacob. I think it is inherent in the litigation. Since
11  you are going to be continuing this litigation anyhow, I am not
12  so sure the incremental burden is that great.
13          MS. JACOB: Your Honor, my concern is not so much
14  having to work over the next 60 days, that is fine. My concern
15  is that we don't want to be precluded from bringing in evidence
16  that we night not unearth in 60 days.
17          THE COURT: You might not find it in that 60 days?
18          MS. JACOB: That's correct.
19          THE COURT: Well, what am I to do, just forget about
20  my decision?
21          MS. JACOB: Your Honor, my suggestion would be that
22  perhaps we don't need -- I agree that there should be a
23  deadline by which people should try to find their files and I
24  would agree that Con Ed should be given a deadline, and fairly
25  short deadline, maybe 60 days, to find this missing file that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

689J911M                    Motions

1  perhaps they should have figured out there was an engineering
2  file sometime before this May.
3          But since this area goes to very much I think the
4  heart of a lot of this case, perhaps we don't need expedited
5  discovery or separate discovery or an early resolution of it.
6  The Cantor signer defendants are being brought back in as third
7  parties anyway. Silverstein is in the process of doing that.
8  The rest of us will bring cross-claims anyway. They will be in
9  the litigation.
10          Maybe we should permit the discovery to proceed as it
11  is going now so everybody has a full opportunity to discovery
12  as we need and things aren't missed, I don't want to say in
13  haste, but things aren't missed because of deadlines, and more
14  toward the end of that discovery this motion can be renewed by

Page 11

```
                         689J911M
15   Con Ed.  If at that point Con Ed has managed to prove it has a
16   claim against Cantor, because they will be in this case, it is
17   not we need them to be a named party by Con Ed in order for
18   them to be responsible.  That is our proposal.
19             We have begun discovery.  We set up a document
20   repository.  Documents are being produced.  We are in the
21   process now of doing quality checks of the first 4,000
22   documents.  It is not as if nothing has happened.  We are
23   concerned if every time somebody brings up a motion, we have a
24   separate perhaps focus, perhaps not so focused bit of
25   discovery, it will distort our ability to move the case.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    25
```
     689J911M                 Motions
1              THE COURT:  Under the case management order of July
2    18, production of documents was to begin by August 22, 2006.
3    It doesn't say when it is to end, and it says that depositions
4    are to await document production and document review.
5              60 days from today is roughly mid-October.  I think it
6    would be quite reasonable to have closure on document
7    production by around that time for the limited purposes of our
8    assemblage today and for the general purposes of this entire
9    litigation.  We are not going to be litigating this for our
10   professional lives.
11             MS. JACOB:  My only comment on that is that according
12   to the case management order, I believe we have until December
13   1 to bring third-party actions as of right.
14             THE COURT:  That is much too far off.  If that is the
15   case, I need to amend that.  I don't propose to have this case
16   go on that kind of a leisurely schedule.  It is not going to
17   happen.
18             MS. PRINGLE:  Your Honor, Katherine Pringle, and I
19   represent Silverstein Properties and also 7 World Trade Center.
20             We anticipated I think some of the concerns that
21   you're raising; and, therefore, served either 214 (d) notices
22   or third-party claims.
23             THE COURT:  That is a 214 notice?
24             MS. PRINGLE:  The notices required under 214 (d)(2) to
25   design and construction professionals.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    26
```
     689J911M                 Motions
1              THE COURT:  Under the CPLR?
2              MS. PRINGLE:  Correct.  Those parties are out of this
3    case because we found they don't owe a direct duty to Con Ed we
4    have sought to bring back into this case on the theory that,
5    okay, whether or not they owe a direct duty to Con Ed, they owe
6    a direct duty to us.  If we are liable on a contingent claim,
7    if we liable, which we don't think they are, those third
8    parties are liable as well.  That process of bringing them back
9    into the case is well under way.
10             THE COURT:  I hope you come to regret that decision.
11             MS. PRINGLE:  Well, our point is that again we don't
12   believe we are directly liable.
13             THE COURT:  I think you are doing things by the book
14   rather than according to any real understanding of what is
15   going on, but I am just a judge.
16             MS. PRINGLE:  Our thinking was --
17             THE COURT:  I know what your thinking was.
18             MS. PRINGLE:  If the parties are to be brought back
19   into the case, we should do it sooner than later.
                              Page 12
```

```
                          689J911M
     20              THE COURT:  I know if you bring them back, it is
     21     better to do it sooner, but it might have been better not to
     22     bring them back.
     23              Mr. Sachs, you are the one interested in moving this
     24     case?
     25              MR. SACHS:  Yes.
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```
                                                                        27
```
            689J911M                      Motions
     1               THE COURT:  December is too late.
     2               MR. SACHS:  I actually opposed that.  I didn't want
     3      third-party complaints to go out that way.
     4               THE COURT:  Production is going to end.
     5               MS. JACOB:  I hate to interrupt the court.
     6               Before the court sets the date, what has held things
     7      up really over the summer has just been getting the document
     8      repository under way, and I think we might need a little more
     9      information to know how rapidly documents can be loaded into
     10     the document repository and made available.  There is a bit of
     11     lag at the beginning which we believe will make things move
     12     much, much faster once the documents get in the repository and
     13     all the parties have access to them.
     14              THE COURT:  Is there a repository?
     15              MR. SACHS:  There is.
     16              MS. JACOB:  It is set up and we have begun producing
     17     the documents.
     18              THE COURT:  Are you producing electronically?
     19              MR. SACHS:  Yes, we are, and we worked very hard over
     20     the summer to get this going.  There are glitches.  Those
     21     glitches are not anybody's fault.  There are electronic
     22     glitches, but we should be up and running in a week or so, we
     23     hope.
     24              THE COURT:  Are the documents being put in by picture?
     25              MR. SACHS:  They're in.  They have been coded and
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```
                                                                        28
```
            689J911M                      Motions
     1      scanned.
     2               MS. JACOB:  It depends to some extent on how old the
     3      documents are and what the original form is.  If they exist
     4      electronically, they were produced electronically.  The old
     5      documents were produced in hard copy.  They're being scanned
     6      in, and it is an existing image, but a searchable image.  The
     7      expedited discovery involved in Citigroup's motions or
     8      potential motions, those documents have been produced to the
     9      repository.
     10              What we have is 4,000 of them, I believe, which we are
     11     now reviewing to make sure all of the processes are working
     12     well before we make a mistake with hundreds of thousands of
     13     documents.  That is going to take some time.
     14              THE COURT:  I propose that document production end by
     15     October 13.
     16              MR. SACHS:  13?
     17              THE COURT:  Is that unfeasible, Ms. Jacob?
     18              MS. JACOB:  I am not sure.  It is depending on how
     19     many there are.  I don't think there is any way the document
     20     repository itself will get them all in and get them out to
     21     people, to have people to have an opportunity to review them.
     22     If this means --
     23              THE COURT:  No, not review.  October 13th to get all
     24     production complete in the case and on this particular issue as
```

```
                            689J911M
25    well.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

29

```
      689J911M                   Motions
1          MS. JACOB: Yes, your Honor.
2          THE COURT: Notwithstanding due diligence, if you
3     can't do it by October 13th, you'll ask me for an enlargement.
4     I would like it done by October 13th.
5          I would like to start depositions in a month or so
6     after that, but we should have our next meeting in October. I
7     propose a meeting at 2:00 o'clock on October 27th, Friday. The
8     purpose of that meeting will be to establish deposition
9     schedules and chart discovery thereafter in the case as a whole
10    and this case. Ms. Jacob has a good point, that we might be
11    creating too many tracks if we try to do this separately.
12         MR. SACHS: I concur with counsel, your Honor, but may
13    I just suggest to the court that if these documents are going
14    to be produced on October 13th, I know the system and the
15    electronic system means it is going to take several weeks for
16    these documents, which I assume are going to be very
17    substantial in the whole case to be scanned and coded and
18    available to even look at.
19         I don't believe we'll even get to them. If they were
20    produced by the 13th and, Beth, correct me if I am wrong, but I
21    don't believe -- Mr. Leavy has been working on this -- I don't
22    believe we will have them to look at, I don't think the parties
23    will have access to them for probably close to 30 days
24    thereafter. Am I correct about that? Am I?
25         MR. LEAVY: Michael Leavy from the firm of Gennet,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

30

```
      689J911M                   Motions
1     Kallmann, Antin & Robinson for Con Ed. Yeah, there is a
2     built-in delay between the time --
3          THE COURT: I take your point. November 30 might be
4     more realistic, which is a Thursday, at 4:00 o'clock. That is
5     the week after Thanksgiving. Is that going to be a terribly
6     inconvenient week for anybody?
7          MR. SACHS: No.
8          THE COURT: November 30.
9          MR. SACHS: That is for the next meeting, your Honor?
10         THE COURT: Yes. To go back here, if we are going to
11    produce documents beginning August 22, I would like August 15
12    to be the last date to discover documents relevant to the
13    issues that we're meeting on today.
14         MR. MALONEY: I couldn't hear you.
15         THE COURT: I would like August 15th.
16         MR. SACHS: I thought you were giving us 60 days, your
17    Honor, on the --
18         THE COURT: Sorry. I have got this wrong.
19         MR. SACHS: You just gave me a --
20         THE COURT: Sorry. I said 60 days from today.
21    October 13.
22         MS. PRINGLE: Could you repeat the purpose of the
23    October 13th date.
24         THE COURT: For documents that have not been located
25    to date dealing with the design and construction of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

31

```
      689J911M                   Motions
                                 Page 14
```

689J911M

1  building and identifications of witnesses involved in that
2  insofar as they relate to this argument of a relationship with
3  Con Edison. In other words, what we're really interested in to
4  see is what was Con Edison's involvement in reviewing the
5  design for the Salomon generation, power generation scheme.
6         MR. SCHRENKINGER: Your Honor, may I ask something?
7         THE COURT: Yes.
8         MR. SCHRENKINGER: That is what I am a little confused
9  about. From what I understood from the plaintiff's papers, Con
10 Edison's papers, they were talking about Con Edison's
11 involvement with the original design and construction of the
12 building.
13         THE COURT: 1982.
14         MR. SCHRENKINGER: It is my understanding the Salomon
15 project, while it was a big project and part of that building,
16 it was a separate project, it might have been the engineer on
17 both the original design and tenant fit-out for Salomon
18 projects.
19         THE COURT: So?
20         MR. SCHRENKINGER: My question is the cutoff date for
21 the Con Edison involvement. Are you referring to the design
22 and construction of the building, design and construction of
23 the Salomon Brothers' project?
24         THE COURT: Both.
25         MR. SCHRENKINGER: Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

689J911M                    Motions
1         THE COURT: I am not going to schedule a separate
2  meeting for this issue. We'll take it up on November 30. Any
3  comments? Are my views understood?
4         MR. SACHS: Yes.
5         MR. SCHRENKINGER: Yes.
6         THE COURT: In evaluating what I will have to do, my
7  tentative thinking is that Mr. Sachs is going to have to show
8  that Con Ed made it clear to those professionals who
9  Silverstein engaged that Con Ed would have a continuing review
10 relationship to assure itself that nothing material would be
11 changed in the setup of the building that would cause danger to
12 Con Ed. I think that would show the kind of functional
13 equivalent of privity that Judge Kay had in mind in the
14 Ossining case.
15         The citation for Ossining is Ossining Union Free
16 School District v. Anderson, 73 N.Y.2d 417 (1989)..
17         MR. SACHS: In your concept of how this goes, your
18 Honor, when would we have an opporunity to address legally
19 whether that should be the standard for review of special
20 relationship?
21         THE COURT: I am not looking to change the rule I
22 expressed.
23         MR. SACHS: I am not, either. That wasn't my point.
24 Let me be specific. You used the phrase that Con Ed told the
25 design professionals that it would have a continuing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

689J911M                    Motions
1  opportunity to review. That is not in Ossining. That is not
2  anywhere that I can find, and all I am asking is --
3         THE COURT: That is my interpretation of the
4  functional equivalent to privity.
5         MR. SACHS: So we have no opportunity to argue --

Page 15

```
                            689J911M
 6          THE COURT:  Judge Kay's first point is the defendant
 7   must be aware that its work would be used for a particular
 8   purpose.
 9          MR. SACHS:  Right.
10          THE COURT:  The second point, plaintiff must rely upon
11   defendant's work.
12          MR. SACHS:  Correct.
13          THE COURT:  The third point, there must be some
14   conduct by the defendant linking it to the plaintiffs and
15   evincing its understanding of that reliance.
16          MR. SACHS:  I understand those tests.
17          THE COURT:  That relates to what I just said.  Now, if
18   you find a different way of applying that, that is open to you,
19   Mr. Sachs.
20          MR. SACHS:  It is the three prongs of that test you
21   are summarizing what you think it means.  Is that what I
22   understand from this?
23          THE COURT:  Yes, essentially.
24          MR. SACHS:  Thank you.
25          THE COURT:  Essentially.  I am not saying I am
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    34
```
     689J911M                     Motions
 1   summarizing it.  It seems to me that would illustrate, in my
 2   view, what Judge Kay had in mind.
 3          MR. SACHS:  There might be other illustrations that
 4   could do the same.
 5          THE COURT:  There might well could be other
 6   illustrations.
 7          MR. SACHS:  Thank you, sir.
 8          THE COURT:  I am applying the rule.  I don't think it
 9   applies only to cases of representations, negligent
10   misrepresentations.  I think it applies just as well to the
11   kind of case we have, and in terms of representations, you can
12   look at a set of plans, representations of what is going to be
13   built.  I am not sure it is different.  In any event, I am
14   applying that rule.
15          MR. SACHS:  I hear you.  I understand.  I wanted to
16   clarify for myself, sir.  Thank you.
17          THE COURT:  Okay.  Let me go back to a comment Ms.
18   Pringle made.  If plaintiffs are suing for the negligent
19   creation of a risk to Con Edison's substation, and if
20   Silverstein engaged someone to do a building that he did, why
21   can Silverstein's liability be laid off on contractors that
22   Silverstein engaged, recognizing that Silverstein had his own
23   professionals who were doing what the contractors did and that
24   the building stood in very fine fashion for so many years until
25   it burnt on September 11th and collapsed.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    35
```
     689J911M                     Motions
 1   What is the rationale for bringing in third parties?
 2          MS. PRINGLE:  Your Honor, I think there are two points
 3   that are raised by your question:
 4          First, I think the fact that the building stood for so
 5   many years, et cetera, suggests there is no liability by
 6   Silverstein.  But what plaintiff has alleged is two-pronged:
 7   Number one, that there was some sort of design defect in the
 8   building; and, number two, that we allowed our tenant Citigroup
 9   to come in and build a system that ultimately they allege
10   turned out to be defective.
                            Page 16
```

```
                             689J911M
11              Prom the perspective of Silverstein, they made none of
12     those decisions.  Those decisions, what they did do was to hire
13     outstanding contractors.
14              THE COURT:  I don't believe it, in that Silverstein
15     rendered the building to Salomon and Salomon insisted I want a
16     24-hour-trading floor, the implications of that was to have an
17     independent source of power.  So the condition of the rental
18     was the very condition that created the risk that Silverstein
19     assumed.
20              MS. PRINGLE:  However, there is more to it than that
21     which is important.  It is not as though Silverstein simply
22     said to Salomon we will take care of all of that.  What they
23     said is we well give you permission to build your own system,
24     and they came in and built a system which Silverstein reviewed
25     merely for the question of whether it would fit within or harm
                       SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

                                                                            36
```
        689J911M                    Motions
1      the existing structure.
2               THE COURT:  I don't believe it.
3               MS. PRINGLE:  In other words, you can't drill it into
4      a concrete --
5               THE COURT:  I don't believe it.  That is not the way a
6      major real estate owner operates in the City of New York.
7               MS. PRINGLE:  We will demonstrate, we are quite
8      confident, through discovery that the responsibility for the
9      Salomon system was undertaken by Salomon.
10              In addition to that, there are agreements as between
11     the Port Authority, Salomon and 7 World Trade Center, in which
12     Salomon undertook to indemnify both the Port and Citigroup --
13     excuse me -- and 7 World Trade for any damages arising out of
14     their fuel system, and there are three separate agreements.
15     They were done in great detail and it makes it very clear that
16     any obligations for harm arising out of that system were
17     assigned by the three parties to Salomon and Salomon alone.
18              THE COURT:  I would like to consider when we have our
19     next meeting whether all those third-party claims should be
20     deferred for resolution after the resolution of the case in
21     chief.  I think there is a real risk that the third-party
22     claims will get in the way of the primary claims and that it
23     would defeat the interests of justice to have everything
24     litigated at the same time.
25              MS. PRINGLE:  I appreciate your point, your Honor, and
                       SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

                                                                            37
```
        689J911M                    Motions
1      we'll be prepared to discuss that at the next meeting.  I would
2      just note at this stage that there will be discovery of those
3      third parties, they will be at the table because so much of
4      this turns not on decisions that --
5               THE COURT:  You may have to do it again.
6               MS. PRINGLE:  I think that is not in the interests of
7      justice to do this case intentionally twice.
8               THE COURT:  You may have to do it again.  You may have
9      to do it again.
10              MS. PRINGLE:  I understand, and we'll be prepared to
11     discuss that.
12              THE COURT:  There are primary claims and there are
13     secondary claims.  Your theory of liability is you aren't or
14     may be liable.  What you are talking about is you may be liable
15     and you may never be liable.  If you are liable, it may be on
```

```
                              689J911M
16   particular grounds that will not be involved in third-party
17   complaints, and I don't think it is prudent in terms of economy
18   or efficiency to do both things at once, but we'll consider
19   that at a later time.  I want to give you a heads-up.
20         MS. PRINGLE:  Would you prefer to have briefs on that
21   in advance of our next meeting?  There is quite a bit of law in
22   this area.
23         THE COURT:  If we'll have briefs, I'll ask for them at
24   the time.
25         MS. PRINGLE:  Sorry?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

                                                                         38
```
     689J911M                      Motions
1          THE COURT:  If we have briefs, I'll ask for them at
2    the time.  No, I don't want any briefing now.
3          MS. PRINGLE:  Thank your Honor.
4          THE COURT:  Anything else for anybody?  Enjoy the rest
5    of the summer.  I'll see you on November 30th.
6          (Court adjourned)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```