# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

AEGIS INSURANCE SERVICES, INC., et al.,

           Plaintiffs,

    - against -

7 WORLD TRADE CENTER COMPANY, L.P., et al.,

           Defendants.

------------------------------------------------------------- X

04 Civ. 07272 (AKH)

## CITIGROUP INC. AND CITIGROUP GLOBAL MARKETS HOLDINGS INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

CLEARY, GOTTLIEB, STEEN & HAMILTON
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendants Citigroup Inc.,
Citigroup Global Markets Holdings Inc.,
Salomon Inc. and Salomon Smith Barney
Holdings Inc.

Of Counsel:
    Thomas J. Moloney
    Lewis J. Liman
    Karen Bekker
    R. Zachary Gelber

# TABLE OF CONTENTS

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | iii |
| PRELIMINARY STATEMENT | 1 |
| FACTUAL BACKGROUND | 5 |
| ARGUMENT | 8 |

**POINT I**

AEGIS'S CLAIM FOR NEGLIGENCE MUST BE DISMISSED, BECAUSE CITIGROUP DID NOT BREACH ANY DUTY TO CON EDISON .......... 8

    A.    CITIGROUP DID NOT OWE CON EDISON ANY DUTY .......... 9

    B.    THE EVENTS OF SEPTEMBER 11, 2001 WERE NOT REASONABLY FORESEEABLE .......... 12

    C.    CON EDISON'S RIGHT TO BRING ANY CLAIM IS BARRED BY ITS LEASE WITH THE PORT AUTHORITY .......... 13

**POINT II**

AEGIS HAS NOT PLED A CAUSE OF ACTION FOR NEGLIGENCE PER SE .......... 17

**POINT III**

THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES ANY CLAIM PURPORTEDLY BASED ON THE DESIGN AND CONSTRUCTION OF CITIGROUP'S SPACE AT 7WTC .......... 19

    A.    THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES ANY CLAIM FOR NEGLIGENCE PER SE .......... 19

    B.    COMPLIANCE WITH PORT AUTHORITY REGULATIONS PRECLUDES A CLAIM OF COMMON LAW NEGLIGENCE BASED ON ALLEGED DESIGN DEFECTS OR CONSTRUCTION FLAWS .......... 22

KEEP
KEEP
KEEP

|  | Page |
|---|---|
| **POINT IV** | |
| AEGIS'S ALLEGED DAMAGES ARE TOO REMOTE AND SPECULATIVE AND THEREFORE ITS CAUSES OF ACTION ARE UNSUSTAINABLE | 25 |
| **POINT V** | |
| THE TERRORIST ATTACK ON THE WORLD TRADE CENTER AND THE UNANTICIPATABLE ACTIONS OF THE FIRE DEPARTMENT WERE, IN ANY EVENT, SUPERSEDING CAUSES | 27 |
| **POINT VI** | |
| AEGIS'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS | 29 |
| **POINT VII** | |
| THE COMPLAINT FAILS TO IDENTIFY ANY BASIS FOR CLAIMS AGAINST CITIGROUP INC., SALOMON INC. OR SALOMON SMITH BARNEY HOLDINGS INC. | 30 |
| CONCLUSION | 32 |

FILE 05856

Defendants Citigroup Inc. and Citigroup Global Markets Holdings Inc. ("CGMH", and together, "Citigroup") submit this Memorandum of Law in support of their motion to dismiss the Complaint dated September 10, 2004 ("Complaint") of Aegis Insurance Services Inc., et al, ("Aegis" or "plaintiff"), as subrogees of Consolidated Edison Company of New York, Inc. ("Con Edison"), pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

The worst terrorist attack in American history occurred on September 11, 2001, causing the loss of over 2800 lives, countless injuries and the partial or total collapse of eight major office buildings. 7 World Trade Center ("7WTC") was one of the buildings destroyed in the attack and, along with it, the Con Edison power station underneath 7WTC (the "Substation"). This case is an attempt by Aegis and other casualty insurance companies to shift the insurance loss resulting from the destruction of the Substation onto Citigroup, which was no more than a tenant of 7WTC and, in economic terms, itself a major victim of the terrorist attack.

Fortunately, no one was injured at 7WTC and no one died there; this case is only about money. Specifically, it concerns the issue of whether a group of insurers -- insurers who, for years, accepted premiums to insure against exactly this type of unpredictable and unavoidable catastrophic risk -- can now obtain a windfall recovery. In its zeal to sue every company with any connection to the construction, design, operation or maintenance of 7WTC, the insurance company plaintiff has created a case management monstrosity that this Court recently recognized might not even be justiciable.

Again, fortunately, there is a way to cut through the Gordian knot of this litigation. The common law doctrines of duty and of proximate and intervening cause are the

tools that can chisel this case down to a manageable size, if applied here at this pleading stage. The same winnowing result can be reached by simply holding the parties to their contractual agreements concerning allocation of liability and responsibility for obtaining insurance, or by applying the proper statute of limitations. Following any one of these paths achieves the result of dismissing Citigroup from this action -- a result that common sense dictates is correct.

As the purported subrogee of Con Edison, a tenant of Port Authority in the substation beneath 7WTC, Aegis asserts two claims. The basis for one cause of action, the third cause of action in the Complaint, is an allegation that Citigroup was "negligent in the design, construction, installation and use of" its backup generator system (the "Emergency Backup System") -- a system installed to power emergency life support systems and to allow Citigroup to continue its global trading and market-making activities in the event of an electrical power failure. Complaint ¶ 90. Aegis's other cause of action, the fourth cause of action in the Complaint, is for negligence per se and is purportedly based on an alleged failure to comply with unspecified New York City and State fire and safety codes. Complaint ¶ 125.

In assessing the adequacy of the Complaint, this Court is entitled to go beyond the pleading itself and to consider documents referenced in the Complaint, documents that the plaintiff has relied on in framing the Complaint, documents that are integral to the Complaint and documents containing information of which the plaintiff had notice.[1] The Court is also entitled to consider documents attached to the Complaint as exhibits or incorporated in it by reference,

---

[1] See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 44 (2d Cir. 1991); Menaldi v. Pay-Per-View Network, Inc., No. 97 Civ. 6451 (HB), 1998 WL 230994, at n.5 (S.D.N.Y. May 5, 1998) (considering lease on motion to dismiss action alleging owner negligently maintained property), aff'd, 182 F.3d 900 (2d Cir. 1999); Heathcote Assocs. v. Chittenden Trust Co., 958 F. Supp. 182, 185 (D. Vt. 1997) (considering lease, proposed lease, lease rider and letter repudiating lease proposal).

2

FILE 05863

admissions made by the plaintiff in pleadings filed with this Court in other, related cases, and matters of which judicial notice may be taken.[2]

In considering these documents, the Court will learn that the only arbiter of code compliance, the Port Authority of New York and New Jersey (the "Port Authority"), has unequivocally determined that Citigroup complied with all applicable building codes. CGMH[3] retained world-class professionals to carry out this project, including the architectural firm Skidmore, Owens and Merrill ("SOM")[4], the mechanical engineering firm Flack + Kurtz Inc. ("F+K"), and the Office of Irwin G. Cantor, P.C. ("Cantor")[5] as structural engineer. The work of CGMH's professionals was reviewed and approved by Silverstein Properties, Inc.'s ("Silverstein") own team of professionals and then again by the Port Authority and its experienced team of engineers. After this extensive review process, the Port Authority issued a Permit to Occupy evidencing that its requirements had been met.[6] See Port Authority Permit to Occupy or Use, dated September 21, 1994 ("Permit to Occupy"), attached as Exhibit A.

The Court will also learn that even now, more than three years after the tragic events of September 2001, despite much study, the precise causal chain leading to the destruction of 7WTC and the Con Edison Substation remains unknown. The May 1, 2002 Federal

---

[2] See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).
[3] At the time of the construction, the entity now known as CGMH was known as Salomon, Inc.
[4] SOM has been retained in the design of the new Freedom Tower. See http://www.renewnyc.com/plan_des_dev/wtc_site/new_design_plans/freedom_tower/freedom_tower_team.asp.
[5] Cantor designed the original 7WTC building for Silverstein Properties, Inc. ("Silverstein").
[6] In the Three Party Agreement by and among the Port Authority of New York and New Jersey, 7 World Trade Company, and Salomon Inc., dated November 23, 1988 (the "Three Party Agreement"), which was executed simultaneously with the CGMH Lease, ground lessor Port Authority retained the right to review all building plans, including those associated with the Emergency Backup System, and to inspect the construction. See Ex. B, Three Party Agreement, §§ 5.1(a)-(b), 5.3 ("[T]he Port Authority shall be entitled to review and inspect the progress of such Initial Work at any time and to require that any of such Initial Work which does not comply with the Building Codes be modified, replaced or redone at Salomon's [Citigroup's] expense."), 6.1-6.4, Exhibit B to the Three Party Agreement ¶¶ 16, 37-38. Like Silverstein's review of the plans, the Port Authority's review was done at Citigroup's expense. See Ex. B, Three Party Agreement, §§ 5.6, 6.5. Moreover, the Permit to Occupy states that the Port Authority inspected the plans and the actual construction. Ex. A, Permit to Occupy. All references to exhibits are references to the exhibits attached to the accompanying Declaration of Karen Bekker, dated November 23, 2004.

3

Emergency Management Agency report entitled "World Trade Center Building Performance Study" (the "FEMA Report"), cited in paragraph 95 of the Complaint, does not contain any allegation that CGMH acted negligently in the construction of its Emergency Backup System, nor does it claim any failure on CGMH's part to comply with all prevailing fire and safety building codes and regulations. See FEMA Report, attached as Exhibit C.[7] The FEMA Report does not place any blame on anyone other than the terrorists for the collapse of 7WTC, and appropriately so. That the terrorists are, perhaps, outside of the Court's jurisdiction, does not change the fact that Citigroup is not guilty of any negligent or otherwise wrongful conduct.

The entirety of Aegis's Complaint with respect to Citigroup fails as an initial matter because Citigroup owed Con Edison no duty of care. Citigroup breached no duty to Con Edison and did not proximately cause the destruction of the Substation, and, in any event, Con Edison's Lease precludes any such claim. Aegis's claim for negligence per se fails as a pleading matter, because Aegis has not alleged violations of law sufficient to sustain that cause of action, and the Port Authority's approval precludes Aegis from asserting a negligence per se claim or any other negligence claim based on the design and construction of Citigroup's space or the Emergency Backup System at 7WTC. Aegis's claims are also precluded by the applicable statute of limitations and by the fact that the nature of the alleged damages is too speculative. In addition, both of Aegis's claims fail because the terrorists and the inability of the fire department to respond to the fire were, in any event, superseding causes of 7WTC's destruction. Finally, the

---

[7] The Court should take judicial notice of the contents of the FEMA Report, a published report of a government agency. See United States v. Archer, 241 U.S. 119, 132 (1916) (taking judicial notice of United States Engineers' report regarding the behavior of a river); United States v. Gonzalez, 442 F.2d 698, n.10 (2d Cir. 1969) (taking judicial notice of facts stated in report of Department of Narcotics and Dangerous Substances); Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002). The FEMA Report is also not inadmissible as hearsay because it falls under the exception in Rule 803(8)(C) of the Federal Rules Evidence, which allows "factual findings resulting from an investigation made pursuant to authority granted by law . . . ."

4

FILE 05865

complaint fails to make <u>any</u> allegation against Citigroup Inc. (as opposed to CGMH) and for this reason as well, the claim against Citigroup Inc. should be dismissed.

## FACTUAL BACKGROUND

On the morning of September 11, 2001, terrorists hijacked four commercial passenger aircraft and deliberately flew two of them into World Trade Center towers 1 and 2 ("1WTC" and "2WTC"). Complaint ¶ 100; Ex. C, FEMA Report at p. 1. Within less than two hours, both 1 and 2WTC had collapsed, showering debris onto neighboring structures and resulting, by the end of the day, in the total or partial collapse of eight other major buildings, including 7WTC. Complaint ¶¶ 101, 103; Ex. C, FEMA Report at p. 1

Some of the larger debris falling from 1 and 2WTC struck 7WTC, a 47-story office tower across Vesey Street from the remainder of the WTC complex, <u>id.</u> at Table 1.1, pp. 2-27, 5-1, and started multiple fires on various floors of 7WTC. <u>Id.</u> at pp. 1-8, 5-16, 5-20; Complaint ¶ 103. Observers reported the first fires on approximately floors 6, 7, 8, 10, 11 and 19. Ex. C, FEMA Report at p. 5-20. While the extent of structural damage to 7WTC caused by the collapse of 1WTC and of 2WTC is unknown, photographic and eyewitness evidence indicates that there was damage to floors 8 through 20, 24, 25, and 39 through 46. <u>Id.</u> at pp. 5-16, 5-20.

In addition to the direct damage inflicted on 7WTC, the collapse of 1 and 2WTC destroyed several water mains, <u>id.</u> at p. 1-8, including the one at Vesey Street needed to fight the fires at 7WTC. <u>Id.</u> at p. 5-21. Because water was unavailable, and because of the damage to 7WTC caused by the collapse of 1 and 2WTC, <u>id.</u> at pp. 1-8, 5-21, 5-24, the fire department made the decision . . . not to attempt to fight the fires," letting them burn uncontrolled. <u>Id.</u> at p. 5-21. As a result, the fires "progressed throughout the day fairly unimpeded. . . ." <u>Id.</u>

5

The Federal Emergency Management Agency ("FEMA") believes that fire was primarily responsible for the collapse, but found no clear evidence of where or on which floor the initiating structural failure occurred. Id. at p. 5-24. FEMA posits a number of possible mechanisms leading to the collapse of 7WTC, but ultimately concludes that even its best hypothesis had "<u>a low probability of occurrence.</u>" Id. at p. 5-31 (emphasis added).

\* \* \* \* \*

Well before 7WTC was designed and built, the Port Authority built an electrical Substation within the World Trade Center area, and leased the Substation to Con Edison, so that Con Edison could supply electricity to the World Trade Center complex. See Agreement of Lease dated May 29, 1968 by and between The Port of New York Authority and Consolidated Edison Company of New York, Inc. ("Con Ed Lease"), attached as Exhibit D. The Con Ed Lease allowed Port Authority to build a rental office building above the Substation, and allocated the risks and obligations associated with that building, such that, in case of damage to the Substation caused by that building, Con Edison's exclusive remedy would be against the Port Authority. See Ex. D, Con Ed Lease, §§ 8(a), 8(b), 16. In signing this agreement, <u>Con Edison agreed</u> to waive any claims against <u>future inhabitants of the building that was planned to be built above the substation. Ex. D, Con Ed Lease, § 8(b).</u>

In 1987, after the Substation was completed, 7WTC, the office building contemplated in the Con Ed Lease, was built by 7 World Trade Company pursuant to its lease of the ground rights from the Port Authority. See Agreement of Lease between the Port Authority of New York and New Jersey and 7 World Trade Company, dated December 31, 1980 (the "7 World Trade Lease"), attached as Exhibit E, Preamble, § 3, 4.5-4.11; Ex. C, FEMA Report at p. 5-2. The 7 World Trade Lease provided that "so long as title to the World Trade Center or the

6

premises remains in the Port Authority the Lessee shall not be required to submit its design, construction and building plans and specifications for approval by the City of New York," reflecting both the law and the parties' understanding that the Port Authority was the only governmental entity that could regulate those premises. Ex. E, 7 World Trade Lease, § 4.5.

CGMH leased floors 28-47 and portions of floors 1-5 from 7 World Trade Company, with Silverstein as 7 World Trade Company's management agent. See Lease between 7 World Trade Company and Salomon, Inc., dated November 23, 1988 (the "CGMH Lease") § 2.02, attached as Exhibit F. To ensure that a Con Edison power outage did not interrupt CGMH's trading and market-making activities, CGMH and 7 World Trade Company agreed that CGMH would have the right to install "diesel emergency power generators . . . together with all ancillary equipment therefor," including "fuel lines and risers as required." Ex. F, CGMH Lease at C-10-C-11. The CGMH Lease also included detailed provisions governing the size and layout of the Emergency Backup System, including the approximate amount of generating capacity allowed, the size of the associated fuel tanks, the location of the generators, and the location of the fuel lines and fuel risers. Ex. F, CGMH Lease at C-10-C-11, Exhibit A-5 of CGMH Lease. In addition, Silverstein agreed in the Lease to "facilitate" the installation of the Emergency Backup System by giving CGMH access to 12,000 gallons of diesel fuel capacity. Id. at C-10.

In the course of the build-out, CGMH hired architects SOM, mechanical and electrical engineer F+K, and structural engineer Cantor, and complied with everything that Silverstein, its engineers, and the Lease required. When construction was complete, CGMH obtained a Permit to Occupy from the Port Authority, evidencing that the Port Authority had approved the plans and inspected the construction, and evidencing the Port Authority's judgment that all applicable codes had been satisfied. See Ex. A, Permit to Occupy, ("Based upon . . . the

7

that audit of field construction and/or field records made by the World Trade Department during the progress of work ... have not, to the best of my knowledge and belief, disclosed any evidence that the requirements of the approved Drawings and Specifications and requirements of the Port Authority have not been met, I hereby issue a Permit to Occupy or Use. . . . /s, Eugene J. Fasullo, P.E., Director of Engineering and Chief Engineer.").

The Emergency Backup System included two 6000-gallon tanks under the WTC loading docks.[8] To transport the fuel up to the fifth floor generators, Salomon installed a double-wall fuel pipe with leak detection, connected to a fuel "riser" (i.e., a vertical pipe) inside a masonry enclosure. Ex. C, FEMA Report at p. 5-14. The "critical" transfer trusses mentioned in paragraph 122 of the Complaint were located in a separate room from the fuel pipe and generators, on the other side of a concrete masonry wall several feet away from the fuel pipes. Ex. C, FEMA Report at pp. 5-14- 5-15.

## ARGUMENT

### POINT I

### AEGIS'S CLAIM FOR NEGLIGENCE MUST BE DISMISSED, BECAUSE CITIGROUP DID NOT BREACH ANY DUTY TO CON EDISON

Even if, as Aegis alleges, the placement and the design of the Emergency Backup System did somehow contribute to the destruction of 7WTC, at bottom, there can be no cause of action here because Citigroup did not violate any duty to Con Edison or proximately cause any of Con Edison's damages. First, as nothing more than distant neighbors, Citigroup did not owe Con Edison a duty of care to protect it from the consequences of criminal acts. Second, the causal link between the damages Con Edison complains of and any action by Citigroup is too

---

[8] CGMH's fuel system and tanks were not the only ones in the building: Silverstein had a 12,000-gallon tank under the loading dock and a 275-gallon tank on the 5th floor, the New York Office of Emergency Management had a 6000-gallon tank located between floors 2 and 3, the U.S. Secret Service had a 50-100 gallon tank on the 9th floor, and American Express had a 275-gallon tank on the 8th floor. See Ex. C, FEMA Report at p. 5-14.

8

attenuated, and Con Edison is not a foreseeable plaintiff. Third, any claim that Con Edison could have brought against Citigroup is expressly precluded by the Con Ed Lease.

### A.   CITIGROUP DID NOT OWE CON EDISON ANY DUTY

The New York Court of Appeals has noted that "[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. . . . But . . . the fixing of the 'orbit' of duty, as here, in the end is the responsibility of the courts." De Angelis v. Lutheran Med. Ctr., 58 N.Y.2d 1053, 1055, 449 N.E.2d 406, 407-08, 462 N.Y.S.2d 626, 627-28 (1983), affirming De Angelis v. Lutheran Med. Ctr., 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981). The determination that the courts should "fix[] the orbit of duty" is a long-standing principle of New York common law, reflecting a policy judgment against allowing juries to impose unanticipatable and potentially unlimited liability on parties having only a tenuous link in the chain of causation. Id. The limit of the duty of care is appropriately decided on a motion to dismiss, as it was in De Angelis. Id., see also Lerner v. Fleet Bank, N.A., 318 F.3d 113 (2d Cir. 2003), cert. denied, 124 S. Ct. 532 (2003), (affirming Rule 12(b)(6) dismissal because plaintiffs did not sufficiently allege that the defendant's conduct was the proximate cause of their injuries).

While one co-tenant owes another a duty of care to protect from his own negligence, even co-tenants do not owe each other any duty to protect against outside dangers. In Ryan Transportation, Inc. v. M and G Associates, 266 Conn. 520, 832 A.2d 1180 (2003), one co-tenant sued its neighboring co-tenant after an arsonist burned down their building. The plaintiff alleged that the defendant had known of the threat of arson, and had not sufficiently warned plaintiff or secured its own premises. That court found that tenants have no duty to protect each other from the criminal conduct of third parties.

9

> [T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

Ryan Transp., Inc., 266 Conn. at 525, 832 A.2d at 1184 (internal quotation marks and citation omitted); cf. Gross v. Empire State Building Assocs., 4 A.D.3d 45, 46, 773 N.Y.S.2d 354, 355 (1st Dep't 2004) (granting summary judgment in landlord's favor when landlord had taken significant precautions to protect tenants and visitors); National Fire Protection Association Handbook Vol. I, 1-3 (2003) ("Any harm that occurs inside a built environment could conceivably have been prevented or mitigated, at least in some very small way, by some feasible modification to the built environment. But that definition . . . is far too sweeping to be useful.").

In the extraordinary circumstances of this case, with the background policy against unlimited liability set by the Court of Appeals, the test set forth by Connecticut's highest court is a useful one.[9] There is no allegation that any action of Citigroup caused the fire that caused 7WTC to collapse. Similarly, there is no allegation that Citigroup could or should have anticipated an attack on the Twin Towers of such a scale that would not only affect 7WTC, but that would damage surrounding water mains to the point that fully precluded ordinary firefighting measures. The attack was an outside danger, caused by criminal conduct; Citigroup had no duty to protect a party that was not even its co-tenant in 7WTC but the Port Authority's lessee, who had constructed an underground Substation beneath the building Citigroup inhabited. In constructing its Emergency Backup System, then, Citigroup cannot be said to have owed its

---

[9] Citigroup does not suggest that this Court adopt the Ryan Transport test, but only that this case provides a useful framework for considering the issues presented.

10

underground neighbor a duty to safeguard -- not against ordinary fire -- but against a criminal attack, that, in addition to causing a fire, made that fire unstoppable.

In the beginning of the last century, Justice Cardozo set down the now well-established principle of duty in Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99 (1928). As far as two cases can ever resemble one another, the surreal, totally unimaginable events of September 11, 2001, call to mind the equally (maybe almost equally) improbable set of facts at issue in Palsgraf.

To remind the Court, in that case, a conductor on the Long Island Railroad, in trying to help a passenger board a train, knocked a package out of the passenger's hands. Palsgraf, 248 N.Y. at 340-41, 162 N.E. at 99. Unbeknownst to the conductor, the package contained fireworks, which exploded, causing tremors on the platform. Id., 248 N.Y. at 341, 162 N.E. at 99. The tremors knocked down some scales on the other end of the platform, hitting Mrs. Palsgraf and causing her injury. Id. Although the actions of the conductor were a cause in fact of the injury, the chain of events was too unforeseeable, and the Court found that the Railroad did not owe Mrs. Palsgraf any duty. Id.

Here, before taking possession of its leased premises, Citigroup built an Emergency Backup System. This System was necessary to provide power in case of a Con Edison power failure, both for Citigroup's emergency life support systems and to enable Citigroup to continue the trading and market-making activities upon which pension funds and individual investors, among others, depend. Eleven years later, terrorists seized control of two airplanes, turning them into missiles with which to attack the two buildings adjacent to 7WTC. Ex. C, FEMA Report at p. 1. That attack sent flaming debris flying onto 7WTC, the debris started a fire. Id. at pp. 5-16, 5-20, 5-21. The fire department was unable to combat that fire due

11

FILE 05872

to broken water mains and already severe losses in 1 and 2WTC. Id. at p. 5-21. The fire caused the collapse of 7WTC, causing damage to the Substation underneath the building, which was owned by Con Edison. Id. at pp. 5-1-5-2.

Even assuming, for the purposes of this motion to dismiss, that Citigroup's generators did, as alleged, exacerbate the fire, like the facts in Palsgraf, the situation is too attenuated and the plaintiff too remote to find liability. Like the Long Island Railroad, Citigroup took steps designed only to help its customers and employees, but the unanticipatable, illegal acts of another caused damages so far-flung as to reach a plaintiff distant in logic and in location — a plaintiff that now, having no remedy against the actual wrongdoers, brings this action against a deep-pocket defendant who has committed no actual wrong.

Citigroup is a bank — a bank that was a tenant in 7WTC and a victim of the September 11 attack, and that hired architects and engineers at the very top of their field who complied with all applicable codes. Aegis asks this Court for the opportunity to allow a jury to decide that this defendant can be liable to the owner of a neighboring underground substation for damages that occurred in the midst of the worst attack on American soil, by criminals, and that may or may not have been exacerbated by Citigroup's fully lawful emergency-planning action. This request asks this Court to "extend[] exposure to tort liability almost without limit," De Angelis, 58 N.Y.2d at 1055, 449 N.E.2d at 407, 462 N.Y.S.2d at 627, and should be denied.

### THE EVENTS OF SEPTEMBER 11, 2001 WERE NOT REASONABLY FORESEEABLE

Citigroup has already argued in another action before this Court that as a matter of law the events that occurred on September 11, 2001, were not reasonably foreseeable, and rather than repeat its arguments, Citigroup refers the reader to the discussions at pages 27-29 of its Memorandum of Law in Support of its Motion to Dismiss and at pages 12-14 of Citigroup's

12

Reply Memorandum in Further Support of its Motion to Dismiss in <u>Industrial Risk Insurers v. Port Authority et al</u>, 02 CV 7170. Citigroup argued in those briefs that the connection between the alleged negligence and the injury complained of is attenuated at best and rests on speculative assumptions: if in 1990 the Emergency Backup System — which was found by the Port Authority to satisfy all applicable building codes — had been built differently, both IRI and Aegis argue, 7WTC would not have collapsed in 2001 after terrorists flew planes into the Twin Towers, burning pieces of the Twin Towers fell and landed on 7WTC, and the fire department, having no access to water, stood by while the raging fires burned themselves out. In this action, where the plaintiff is not the subrogee of the landlord but the subrogee of the owner of a power station underneath the building that housed the Emergency Backup System, and the damage complained of is not just to the building itself but to the underground tenant, the connection is even more precarious. Even on a motion to dismiss, where the plaintiff is given the benefit of all reasonable inferences, this assumption cannot stand.

### C. CON EDISON'S RIGHT TO BRING ANY CLAIM IS BARRED BY ITS LEASE WITH THE PORT AUTHORITY

The Lease between Con Edison and the Port Authority gives the Port Authority the right to build a rental office building above Con Edison's Substation and the obligation to ensure that such a building will not interfere with the Substation. At the same time, this Lease gives Con Edison a remedy against the Port Authority if it does not meet this obligation, and bars any claims based on the building above the Substation other than the specified remedy against the Port Authority. As Citigroup is a third party beneficiary of this agreement, Con Edison's claim against Citigroup is barred.

Con Edison and the Port Authority acknowledged the possibility that, at some point after the agreement between them was signed, the Port Authority would construct a

13

building, to be occupied by tenants, above the Con Ed Substation. See Ex. D, Con Ed Lease, § 8(a) ("The Lessee recognizes that the Port Authority may construct . . . on, above or about the Substation Building additional stories, structures, buildings, or improvements of whatsoever design, size and purpose as the Port Authority may . . . determine."). In doing so they agreed that the Port Authority would be obligated to ensure that "no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee. . . ." Ex. D, Con Ed Lease, § 8(a).[10]

After this allocation of responsibility for the integrity of the structure to the Port Authority, the Lease goes on to say that any building above the Substation cannot be the basis of a lawsuit: "[t]he exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be . . . made the grounds of . . . any claim or demand for damages." Ex. D, Con Ed Lease, § 8(b). The Port Authority negotiated for this limitation in the context of an express acknowledgment that there would be a commercial structure that would likely have tenants and subtenants, and for which the Port Authority would ultimately be responsible. Therefore, the bar on claims in Section 8(b) should be construed to extend to such future tenants, including Citigroup.

The intent of Con Edison and the Port Authority to limit Con Edison to a remedy against the Port Authority is again made evident later in the Lease. In section 16, the Lease expressly provides that <u>the Port Authority</u> must bear the cost of repairing any damage to Con Edison's Substation that occurs in connection with the structure above it: "The Port Authority

---

[10] That this provision is part of an overriding plan to have any Con Edison claim directed to the Port Authority is reflected in the 7 World Trade Lease, which provides, "[7 World Trade Company] will conduct its operations in such a manner so as not to disrupt, interfere with or interrupt the operations, property and activities of the Consolidated Edison Company . . . in and to the [Substation]. If as a result of the Lessee's [i.e., 7 World Trade Company's] acts . . . the Port Authority is obligated to reimburse Consolidated Edison for maintenance or repair costs, the Lessee upon demand, will pay such costs to the Port Authority." Ex. E, 7 World Trade Lease, § 17.2.

14

FILE 05875

shall reimburse the Lessee for any expense incurred by the Lessee in . . . replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority . . . in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof." Ex. D, Con Ed Lease, § 16.[11] The only possible interpretation of the section 8 limit on Con Edison's ability to bring lawsuits in conjunction with an express remedy against the Port Authority, is that the bar to lawsuits is one that protects third parties, such as the future tenants of the future building that the Lease envisions. See R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 360 (2002) (granting summary judgment on basis of "unambiguous" contract); Pink v. Am. Surety Co. of N.Y., 283 N.Y. 290, 296 (1940) (affirming the grant of motion to dismiss); AG Capital Funding Partners L.P. v. State St. Bank and Trust Co., 10 A.D.3d 293, 295, 781 N.Y.S.2d 88, 90 (1st Dep't 2004) (reversing trial court's denial of motion to dismiss where "[t]he parties' agreement is facially unambiguous . . . and is enforceable according to its terms").

It is, of course, hornbook law that Citigroup can be a third party beneficiary of the Con Ed Lease, even though Citigroup was not named explicitly in the lease. Associated Teachers of Huntington, Inc. v. Bd. of Educ., Union Free Sch., 33 N.Y.2d 229, 234, 306 N.E.2d 791, 794, 351 N.Y.S.2d 670, 674 (1973) ("It is not necessary that third-party beneficiaries be identified or identifiable at the time of making of a contract."); Finch, Pruyn & Co. Inc. v. M. Wilson Control Servs. Inc., 239 A.D.2d 814, 658 N.Y.S.2d 496 (3d Dep't 1997) (affirming

---

[11] Citigroup takes no position on whether the general allocation of damages scheme was further modified to allow the Port Authority to benefit from the fire insurance Con Edison was expressly required to maintain as explained in Port Authority's motion to dismiss Aegis's Complaint against it in Aegis Insurance Services et al v. Port Authority, 02 CV 7188.

15

lower court's finding that plaintiff was a third party beneficiary, despite not being named in the contract); Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan, 677 F.2d 193 (2d Cir. 1981) (when employee and former employer released each other, the Employee Stock Ownership Plan was a third party beneficiary of the release, though not specifically named). As discussed above, because the lease provides Con Edison with a monetary remedy against the Port Authority for damage to the Substation caused by the structure above it, the bar on claims could only have been intended to apply to third parties inhabiting that structure, and the benefit to Citigroup is an immediate one, as protection from lawsuits is an immediate benefit, even when no lawsuit is threatened. State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427, 435, 741 N.E.2d 101, 104, 718 N.Y.S.2d 256, 259 (2000) ("A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'") (internal citations omitted).[12]

Assuming, arguendo, that Citigroup's Emergency Backup System had some connection to the collapse of 7WTC, the Port Authority's act of authorizing its construction and issuing the Permit to Occupy would be a but-for cause of the damage to the Substation. The damage Con Edison complains of, then, is "damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority" and "in connection with the construction or maintenance of the . . . buildings . . . described in Section 8 hereof." Ex. D, Con Ed Lease, § 16. Thus, the Port Authority agreed, for the benefit of the future tenants

---

[12] The last element, i.e., "indicating the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost" is not applicable as the benefit cannot be lost.

16