# EXHIBIT F

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AEGIS INSURANCE SERVICES, INC., et al.

Civil Action No. 02 CV 7188 (AKH)

Plaintiffs,

- against-

7 WORLD TRADE CENTER COMPANY, L.P. et al.

Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION BY DEFENDANTS CITIGROUP INC. AND CITIGROUP GLOBAL MARKET HOLDINGS INC. TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

---

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs
45 Broadway
30th Floor
New York, New York 10006
(212) 406-1919
File No.: 02-5514:241.0001-K

Stanley W. Kallmann, Esq. (SK5204)
Michael S. Leavy, Esq. (ML6150)
Of Counsel and On The Brief

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    POINT I
    CITIGROUP OWED A DUTY TO CON ED, AND PLAINTIFFS HAVE PROPERLY
        PLEADED A BREACH OF THAT DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    CITIGROUP AND ITS AGENTS INSTALLED THEIR BACKUP
              POWER SYSTEM IN PREMISES CANTILEVERED ABOVE CON
              ED'S, THEREBY OWING A DUTY OF CARE IN ITS DESIGN,
              CONSTRUCTION, OPERATION AND MAINTENANCE, WHICH IT
              BREACHED AS TO CON ED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    RISK OF FIRE WAS REASONABLY FORESEEABLE . . . . . . . . . . . . 6

        C.    THE CON ED LEASE NEITHER CONTEMPLATES NOR GOVERNS
              CLAIMS AGAINST A PA TENANT NOR ANY ASPECT OF DAMAGE
              TO THE SUBSTATION OTHER THAN "REIMBURSEMENT" TO
              CON ED FOR DAMAGE ARISING FROM "ACTS OR OMISSIONS"
              OF THE PA, ITS "AGENTS, SERVANTS OR EMPLOYEES" . . . . . . . 9

    POINT II
    NEGLIGENCE PER SE IS A VIABLE CAUSE OF ACTION . . . . . . . . . . . . . . . . . . 16

    POINT III
    PA'S EXERCISE OF REGULATORY AUTHORITY DOES NOT PRECLUDE
        NEGLIGENCE CLAIMS AGAINST CITIGROUP, AND THE PERMIT TO
        OCCUPY HAS NO RELEVANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    POINT IV
    PLAINTIFFS' DAMAGES, ARISING FROM PAYMENT OF SUMS CERTAIN TO
        CON ED FOR PROPERTY DAMAGE, AND EXPENSES DULY INCURRED
        IN REPLACEMENT OF THAT TANGIBLE PROPERTY AND EQUIPMENT
        ARE NEITHER REMOTE NOR SPECULATIVE . . . . . . . . . . . . . . . . . . . . . 18

POINT V
ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING CAUSE ARE FOR
A JURY, ESPECIALLY WHERE THE FACTS ARE IN DISPUTE; THERE
ARE CLEARLY FACTUAL QUESTIONS AT THIS JUNCTURE.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT VI
PLAINTIFFS' SUIT AGAINST CITIGROUP IS TIMELY. . . . . . . . . . . . . . . . . . . . . . 24

POINT VII.
CITIGROUP FAILS TO OFFER EVIDENCE AS TO WHICH DEFENDANTS ARE
PURPORTEDLY IMPROPERLY NAMED, IF ANY . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

FEDERAL CASES

*Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bonsignore v. City of New York*, 683 F.2d 635 (2nd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 22

*Cuyler v. Adams*, 449 U.S. 433 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Del Cid v. Beloit Corp.*, 901 F. Supp. 539 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lusitania*, 251 F. 715 (S.D.N.Y. 1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Padevan v. United States*, 82 F.3d 23 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Petition of the Kinsman Transit Co.*, 338 F.2d 708 (2nd Cir. 1964), cert. denied 380 U.S. 944 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275 (1959) . . . . . . . . . . . . . . . . . . . . 18

*In re September 11 Litigation*, 280 F.Supp.2d 279, 300 (S.D.N.Y. 2003) . . . . . . . . . . 4, 6, 7, 18

*Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

STATE CASES

*AG Capital Funding Partners L.P. v. State St. Bank and Trust Co.*, 10 A.D. 3d 293, 781 N.Y.S.2d 88 (1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Alamio v. Town of Rockland*, 302 A.D.2d 842, 755 N.Y.S.2d 754 (3rd Dep't 2003) . . . . . . . . . 25

*Amedeo Hotels Ltd. Partnership v. Zwicker Elec. Co., Inc.*, 739 N.Y.S.2d 10 (1st Dep't 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Apollo Steel Corp. v. Melco Cranes, Inc.*, 202 A.D.2d 1049, 609 N.Y.S.2d 121 (4th Dep't 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Assoc. Teachers of Huntington, Inc. v. Bd. Of Ed., Union Free Sch.*, 33 N.Y.2d 229, 351 N.Y.S.2d 670 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919) . . . . . . . . 19

*De Angelis v. Lutheran Med. Ctr.*, 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315-316, 434 N.Y.S.2d 166, 414 N.E.2d 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20, 22

*Eastern Paralyzed Veterans Ass'n v. Camden*, 111 N.J. 389, 545 A.2d 127 (1988) . . . . . . . . . . 18

*Elliott v. City of New York*, 724 N.Y.S.2d 397 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Finch, Pruyn & Co., Inc. v. M. Wilson Control Servs. Inc.*, 239 A.D.2d 814, 658 N.Y.S.2d 496 (3d Dep't 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Garcia v. Union Carbide Corp.*, 176 A.D.2d 219, 574 N.Y.S.2d 341 (1st Dep't 1991) . . . . . . . 27

*Gates v. AOL Time Warner Inc.*, 2003 WL 21375367 (N.Y. Sup. Ct. N.Y. County May 15, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gross v. Empire State Building Ass'n.*, 4 A.D.3d 45, 773 N.Y.S.2d 354 (1st Dep't 2004) . . . . . . 5

*Harris v. New York City Housing Auth.*, 187 A.D.2d 362, 589 N.Y.S.2d 883 (1st Dep't 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hochberg v. N.Y. City Off-Track Betting Corp.*, 74 Misc.2d 471, 343 N.Y.S.2d 651 (Sup. Ct., N.Y. County 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hurst v. Titus*, 77 A.D.2d 157, 432 N.Y.S.2d 938 (4th Dep't 1980) . . . . . . . . . . . . . . . . . . . . . . . 9

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131 (1986) . . . . . . . . . . . . . . . . 19

*Lee Kin Shiu v. City of N.Y.*, 174 Misc.2d 422, 425, 666 N.Y.S.2d 872 (2nd Dep't 1997) . . . . . . 8

*Mandel v. Tiffany*, 263 A.D.2d 827, 693 N.Y.S.2d 759 (3rd Dep't 1999) . . . . . . . . . . . . . . . . . 25

*Mark v. Eshkar*, 194 A.D.2d 356, 598 N.Y.S.2d 255 (1st Dep't 1993) . . . . . . . . . . . . . . . . . . . . 24

*Martinez v. Lazaroff*, 48 N.Y.2d 819, 424 N.Y.S.2d 126 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 23

(iv)

*Mehta v. N.Y. City Dep't of Consumer Affairs*, 162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller v. Board of Education*, 291 N.Y. 25, 29, 50 N.E.2d 529 (1943) . . . . . . . . . . . . . . . . . . . . 8

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519, 429 N.Y.S.2d 606, 613 (1980) . . . . . . . . 4

*Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) . . . . . . . . . . . . . . . . . . . 5, 7

*People v. Rodriguez*, 115 Misc.2d 866, 454 N.Y.S.2d 796 (Crim. Ct. Queens County 1982) . . 17

*Pink v. Am. Surety Co. of N.Y.*, 283 N.Y. 290, 28 N.E.2d 842 (1940) . . . . . . . . . . . . . . . . . . . . 14

*R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360 (2002) . . . . . . . 14

*Rivera v. City of New York*, 227 N.Y.S.2d 676 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ryan Transp., Inc. v. M and G Assoc.*, 266 Conn. 520, 832 A.2d 1180 (2003) . . . . . . . . . . . . . 5

*State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d 256 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002) . 7, 17

*Whitfield v. City of N.Y.*, 239 A.D.2d 492, 657 N.Y.S.2d 757 (2nd Dep't 1997) . . . . . . . . . . . . 8

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATE STATUTES

N.J. Stat. Ann. §§ 32:1-35.61 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. Unconsol. § 6612 (McKinney 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

General Obligations Law § 5-322.1 (McKinney's 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Plaintiffs, Consolidated Edison Company of New York, Inc., ("Con Ed") and its subrogee insurers, submit this brief in opposition to the motion, dated November 23, 2004, of Citigroup Inc. and Citigroup Global Market Holdings Inc. (collectively "Citigroup") pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' claims.

## PRELIMINARY STATEMENT

The motion to dismiss by Citigroup is without basis. At the very least, questions of fact preclude judgment for Citigroup at this time, given that the complaint is presumed to be true.

The risk of loss due to fire, regardless of the precise initiation mechanism, is foreseeable, and Citgroup owed, and breached, a duty to Con Ed in that regard. Moreover, for the reasons set forth in the Reports of FEMA and NIST, and the Preliminary Report of Dr. Fred Mowrer, an expert retained by plaintiffs, appended to the Declaration of Stanley W. Kallmann, it cannot be said that, as a matter of law, there was any superceding or intervening cause, in any event.

The lease between the Port Authority ("PA") and Con Ed, with its recitation that the PA could erect the 7 World Trade Center ("7WTC") building above the Con Ed Substation (the "Substation"), contemplated reimbursement by PA to Con Ed for any damage to the Substation resulting from any negligence of the PA in constructing or maintaining 7WTC. The lease in no way limits Con Ed or its insurers to proceeding **solely** against the PA for the negligence of others, including Citigroup, in causing the destruction of Con Ed's equipment at the fire and collapse site at 7WTC, and indeed is silent as to such a situation.

Citigroup fails to discharge its burden of proof, as well, as to its arguments that certain causes of action should be dismissed, or that the claim is time-barred, or that some of the

1

Citigroup defendants should be dismissed from this action. The matter should proceed to discovery at this time.

## STATEMENT OF FACTS

Bearing in mind that the plaintiffs have had no discovery in this case, the following is a matter of "record": Citigroup occupied premises in 7 WTC which were above the Substation. Thus, the extent of Citigroup's duty includes protecting Con Ed from all risks which were caused by Citigroup's on-site activities, including the backup power system for its trading floor. In supporting that commercial endeavor, Citigroup predecessor Salomon Brothers commissioned and installed a system of 9 electrical generators with capacity of 15,525 kilowatts as backup power for its computerized trading floor. The system included a fuel distribution system which pumped fuel at a rate of 75 gallons per minute, even though the needs of the generators were only 1 gallon per minute each, or 9 gallons per minute, in the aggregate, if all were running. Citigroup therefore designed and constructed a pressurized system with over 8 times the necessary fuel pumping capacity, and greatly exacerbated the risk and consequence of any fire at 7WTC. Citigroup created this excess pumping capacity through a pressurized recirculating loop, at a pressure of 50 pounds per square inch (over three atmospheres of pressure), from two 6,000 gallon underground fuel tanks.

Citigroup placed that system within 7WTC, which was cantilevered over the Substation. Citigroup placed elements of its fuel distribution system within feet of structural trusses 1 and 2, upon which 7WTC rested above the easterly portion of the Substation. There, Citigroup created a fuel distribution apparatus which became, in essence, either a 160 megawatt blowtorch pointed at, or a lake of fire beneath, those structural trusses.[1]  Citigroup and its "world-class

_____

[1]See, the FEMA Report as to all of the foregoing facts, particularly at pp. 5-7, 5-13 through 5-16, and 5-27 through 5-30.

2

professionals" had a duty to protect Con Ed and others commensurate with the danger inherent in the fuel distribution system they created. World-class mistakes resulted in breaches of their duties.

## ARGUMENT

### POINT I

### CITIGROUP OWED A DUTY TO CON ED, AND PLAINTIFFS HAVE PROPERLY PLEADED A BREACH OF THAT DUTY

**A.    CITIGROUP AND ITS AGENTS INSTALLED THEIR BACKUP POWER SYSTEM IN PREMISES CANTILEVERED ABOVE CON ED'S, THEREBY OWING A DUTY OF CARE IN ITS DESIGN, CONSTRUCTION, OPERATION AND MAINTENANCE, WHICH IT BREACHED AS TO CON ED.**

It is a basic principle of common law negligence in New York that one with a possessory interest in real estate, such as Citigroup's leasehold in 7WTC, has a duty to exercise due care as to foreseeable risks arising from its own conduct and activities on the property, as well as those activities of others, such as Con Ed, which concern or are potentially exacerbated by the exercise of its possessory interest.

The Second Circuit Court of Appeals, analyzing cases from New York's Court of Appeals and Supreme Court, Appellate Division, First Department, held that:

> In cases involving liability for injuries arising from conditions on property, the **existence of a duty generally depends upon "occupancy, ownership, control or a special use of [the] premises"** by the defendant. *Balsam v. Delma Eng'g Corp.,* 139 A.D.2d 292, 296, 532 N.Y.S.2d 105 (1st Dep't 1988); cf. *Dick v. Sunbright Steam Laundry Corp.,* 307 N.Y. 422, 424, 121 N.E.2d 399 (1954) (tort liability to tenant or third party "is an incident to occupation and control" of premises by landlord); Restatement (Second) of Torts §§ 328E (1964) (defining "possessor of land" generally as a person in occupation with intent to control land); Restatement §§ 343 (possessors subject to liability for certain conditions on land). **[emphasis added]**

3

*Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996). Indeed, the New York Court of Appeals has discussed a duty of care for "a possessor of land, whether he be a landowner or a leaseholder . . ." *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519, 429 N.Y.S.2d 606, 613 (1980).

In this case, this Court, analyzing similar arguments, has already held that there exists a "duty of landowners and lessors to adopt fire-safety precautions [which] applies to fires caused by criminals . . . even in the case of a fire caused by criminals such as those who hijacked flights 11 and 175 on September 11, 2001." *In re September 11 Litigation*, 280 F.Supp.2d 279, 300 (S.D.N.Y. 2003). This is because, as a general principle of common law negligence, the risk of fire is reasonably foreseeable, even if the precise cause of the fire might not be.

The cases cited by Citigroup in support of the novel proposition that, because it is a tenant in a building, it owes no duty to its downstairs neighbor, either are inapposite, completely irrelevant, have no precedential value, or are all of the foregoing. For example, although it is a well-settled principle that, absent legislation, the ambit of the duty of care is a common-law concept determined by the courts, the case cited by Citigroup, *De Angelis v. Lutheran Med. Ctr.*, 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981), *aff'd* 58 N.Y.2d 1053, 462. N.Y.S.2d 626 (1983), (child has no derivative claim for loss of consortium of parental services in bodily injury case) has no meaningful application to the present matter. Similarly, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) (RICO claim against a bank for improper management of escrow accounts did not plead compensable predicate acts under section 1962), also cited by Citigroup, is not instructive and has has nothing to do with this case, as it relies solely on RICO precedent.

Similarly inapposite is *Ryan Transp., Inc. v. M and G Assoc.* 266 Conn. 520, 832 A.2d 1180 (2003), a Connecticut Supreme Court case which, apart from having no precedential value here, centers on the question of whether one tenant, which observed burn marks on the exterior

4

of the building in which both tenants resided, had a duty to warn the other tenant of the threat of arson by some unknown person. Thus, the risk complained of, fire by arson, was not, as in the instant case, one occasioned by the co-tenant's use and occupancy of its premises. Here, however, it is Citigroup which created and installed an apparatus on its premises which caused the demise of 7WTC and the Substation.

Gross v. Empire State Building Ass'n., 4 A.D.3d 45, 773 N.Y.S.2d 354 (1st Dep't 2004) concerned the particularly narrow issue of those measures a landlord must take to furnish security to visitors. Based on the facts of that case, the evidence the landlord adduced as to its security efforts demonstrated that it had discharged, and not breached, its duty. The case did not determine, as is claimed here, that there was no duty, but that there was a duty, one that the evidence showed had not been breached. Finally, Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928), concerned the scope of duty of a railroad (in loading its passengers and their baggage) to a plaintiff outside the reasonably anticipated danger zone of a dropped package. The Court held that the railroad could not reasonably anticipate that the package would explode, causing a shock wave and tipping over a scale onto plaintiff. Here, however, Citibank could reasonably anticipate that a fire might occur at or near 7WTC, which could turn its overcapacity fuel distribution apparatus into a 160 megawatt blowtorch. It is self-evident that Con Ed was within the zone of danger created by Citigroup's improperly designed and installed system.

5

**B.    RISK OF FIRE WAS REASONABLY FORESEEABLE**

Due to the reasonably foreseeable risk of fire, Citigroup had a duty to ensure that, in the event of fire, its backup power systems, including its fuel supply and distribution systems, would not fuel, spread or exacerbate such a fire. This includes Citigroup's duty to locate the fuel supply and distribution systems for its trading floor backup power systems in such a manner that, should they become involved in a fire, the risk of damage to neighboring tenants and the structure itself were minimized.

Chief Judge Kaye's decision in *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49 (2001), acknowledges the duty a possessor of property has concerning property damage to those nearby, as was recognized by this Court in *In re September 11 Litigation*, 280 F.Supp.2d 279, 292-293 (S.D.N.Y. 2003). In that case, involving the collapse of a scaffold, the extent of defendants' duty to nearby property owners who had suffered property damage was not at issue, and the Court acknowledged that the only issue was the extent of duty to those suffering purely economic loss.

This Court, discussing that case in *In re September 11 Litigation, supra at 292-293*, agreed that the duty of the airlines sued herein ran to those who suffered property damage and personal injury on the ground, stating:

> *532 Madison Avenue* involved collapses of a high-rise office building and a 48-story construction elevator tower, both in midtown Manhattan and both causing busy areas of the city to be closed for a two-week period. The lawsuits sought recovery of financial losses resulting from the closures; plaintiffs had not suffered personal injury or property damage. Applying the considerations set out above, the Court of Appeals limited the scope of defendants' duty "to those who have, as a result of these events, suffered personal injury or property damage," but held that those who suffered merely financial losses could not recover. *Id.* [532 Madison] at 1103. The Court of Appeals acknowledged that "[p]olicy-driven line-drawing is to an extent

6

arbitrary because, wherever the line is drawn, invariably it cuts off liability to persons who foreseeably might be plaintiffs." *Id.* If those who suffered financial losses were to be allowed to sue, the Court of Appeals held, "an indeterminate group in the affected areas" would be able to recover. *Id.* If, however, the field of plaintiffs was to be limited to those who "suffered personal injury or property damage" as a result of defendants' negligence, the limitation would "afford[ ] a principled basis for reasonably apportioning liability," and be "historically" consistent with New York precedents. *Id.*

The cases before me involve claims to recover for personal injuries, death, or property damage. They fall within the line drawn by the New York Court of Appeals in *532 Madison Avenue.* There may be more plaintiffs within the ambit of duty at issue here than those contemplated under the rule set forth in *532 Madison Avenue,* but that is not a principled basis of distinction. I therefore hold that the Aviation Defendants owed a duty of care, not only to their passengers to whom they concede they owed this duty, but also to victims on the ground.

If the operator of an airplane, which can reasonably be foreseen to fall anywhere, has a duty to anyone struck by it, cannot it also be said that the owner and occupants of 7WTC, which could only fall down or fall over nearby, have a duty to those in its shadow?

The cases cited by Citigroup do not suggest otherwise. *Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002), held that plaintiff properly asserted a claim for breach of duty, notwithstanding defendant's evidence of compliance with applicable fire and building codes, and stated:

With respect to the issue of foreseeability, "**plaintiffs need not demonstrate the foreseeability of the precise manner in which the accident occurred or the precise type of harm produced** in order to establish the foreseeability component of their tort claims" (*Di Ponzio v. Riordan, supra,* at 583-584, 657 N.Y.S.2d 377, 679 N.E.2d 616, citing *Palsgraf v. Long Is. R.R. Co.,* 248 N.Y. 339, 344, 162 N.E. 99). [emphasis added]

7

Indeed, to the contrary of Citigroup's position, *see*, *Whitfield v. City of N.Y.*, 239 A.D.2d 492, 657 N.Y.S.2d 757 (2nd Dep't 1997), which held that the acts of an arsonist did not constitute an intervening superceding cause, or destroy proximate causation, in a fire claim.

In *Lee Kin Shiu v. City of N.Y.*, 174 Misc.2d 422, 425, 666 N.Y.S.2d 872 (2nd Dep't 1997), the defendant city's vacant building, which was slated for demolition and leaning over plaintiff's building, caught fire and collapsed onto plaintiff's building, destroying it. The Court agreed that a duty was owed by the owner of the overhanging building, stating:

> In *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315-316, 434 N.Y.S.2d 166, 414 N.E.2d 666, the court stated: "To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury ... Plaintiff need not demonstrate, however, that the precise manner in which the accident happened, or the extent of injuries was foreseeable ... **An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."** In the case at bar, a proximate cause of the destruction of plaintiffs' building was the defendant's negligence in failing to demolish its unsafe building before a fire occurred as well as allowing it to lean over plaintiffs' building so that if it collapsed it would fall onto plaintiffs' building. In the instant matter, the building did collapse because of the fire and it fell onto plaintiffs' building causing its destruction. Defendant is therefore responsible. [emphasis added]

Similarly, the Court of Appeals addressed the implications of multiple actors in *Miller v. Board of Education*, 291 N.Y. 25, 29, 50 N.E.2d 529 (1943), noting that where two or more separate acts combine to bring about plaintff's harm, the chain of causation is not broken.

> Where the defendant has by his conduct set in motion forces which would not have resulted in harm to another but for the failure of a third person to act or perform some duty which the law imposes upon him, the failure on the part of such third person to perform the act does not break the causal relation between the defendant's conduct and the plaintiff's damage.

Finally, in *Hurst v. Titus*, 77 A.D.2d 157, 432 N.Y.S.2d 938 (4th Dep't 1980), a fire caused by the negligence of defendant presented issues of fact which could only be resolved by the jury as to proximate cause, regardless of the possibility of another potential proximate cause, plaintiff's negligent supervision of her child.

Here, as this Court has already decided, Citigroup, in vastly overdesigning its fuel distribution system (and quite possibly its power generation and other systems – plaintiffs, after all, have not had discovery), could have and should have foreseen the risk of fire (but apparently did not, or ignored the risks in favor of its own advantage).

**C.    THE CON ED LEASE NEITHER CONTEMPLATES NOR GOVERNS CLAIMS AGAINST A PA TENANT NOR ANY ASPECT OF DAMAGE TO THE SUBSTATION OTHER THAN "REIMBURSEMENT" TO CON ED FOR DAMAGE ARISING FROM "ACTS OR OMISSIONS" OF THE PA, ITS "AGENTS, SERVANTS OR EMPLOYEES"**

Con Ed's lease with the PA, particularly sections 8(a-b) and 16, is interpreted fancifully in the Citigroup brief at pages 13-17. In actuality and reduced to its essence, the lease provides as follows. In section 8(a):

(1).    PA may build additional structures or decoration upon the Con Ed Substation building;

(2)    PA may not endanger Con Ed's Substation and its contents in connection with such construction, or subsequent repair or maintenance, and;

(3)    PA is responsible for upkeep to the additional structures and decoration of the Substation building.

In section 8(b):

(4)    PA is not liable to Con Ed for rent abatements, eviction, or consequential damages caused during construction or maintenance of the additional structures or decoration.

In section 16:

> (5)  Con Ed has no obligations with respect to construction and maintenance of the additional structures or decoration, and;
>
> (6)  PA shall reimburse Con Ed for any extra expenses caused by the acts or omissions of PA and its agents during construction and maintenance.

The full text of those provisions follows.

Section 8.    <u>Air Space and Port Authority Construction</u>

> a.    The Lessee recognizes that the **Port Authority may construct** wholly or partially on, above or about the Substation Building **additional stories, structures, buildings or improvements** of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine. In connection therewith the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto. The Port Authority agrees that **no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building** by the Lessee contemplated in Section 3 hereof. Without limiting the generality of the foregoing or of any other provisions of this Agreement the **Port Authority in performing such additional construction may**, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, **temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction** and the Lessee hereby consents to such entry, use and construction by the Port Authority.
>
> b.    **The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor be made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.**

                    *              *              *

Section 16.    <u>Responsibility for Other Uses of Premises</u>

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the **obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors;** further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee. **The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements** described in Section 8 hereof. The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance. **[emphasis added]**

It is difficult to see how Citigroup concludes that the **PA's express obligation to "reimburse"** actually means a bar on claims "based on the building above the substation other than the specified remedy against the Port Authority" (Citigroup Brief at 13), or represents a "limit on Con Ed's ability to bring lawsuits" (Citigroup Brief at 15). That interpretation, while wishful thinking, is simply not supported by the contract.

The first problem with Citigroup's imaginative interpretation is that on their face, these lease provisions deal with damage which occurs "in connection with construction or maintenance" to structures above the substation. Since Citigroup has acknowledged that it

completed construction of, *inter alia*, its fuel distribution apparatus in 1990, the 2001 collapse at issue here is not "in connection with" construction or maintenance of 7WTC.

In addition, the plain meaning of the term "reimburse" and the contract provisions surrounding that obligation simply do not support such a strained interpretation. The lease neither contains nor implies the terms "bar" or "limit" or "lawsuit" which Citigroup reads into the works of the lease. The provisions concern only the "entry, use and construction by the Port Authority, or its agents, contractors or employees" on the Substation, not anticipated tenant improvement in a future structure. The lease provisions relied upon by Citigroup do not even discuss occupants or lessees in that structure. Consequently, there is no basis for Citigroup's contention that it is a third-party beneficiary of the lease. The mere recognition that a structure with tenants would be built above the Substation does not translate into an argument that a claim for improper activities by the tenant is limited or precluded.

Moreover, the provisions at issue here concern only "acts or omissions" of PA and its agents "in connection with the construction or maintenance of" the future structure. This clearly means during construction or maintenance of the building, not any premises defect case which might arise 20 years later. The contractual remedy envisioned for any construction- or maintenance-related damages to the Substation, is, as noted above, "reimburse[ment of Con Ed] for any expense incurred . . . in maintaining, repairing, replacing or rebuilding the Substation Building or . . . Equipment." While the contract is silent as to the manner of remedies Con Ed might apply to obtain this reimbursement, lawsuit for breach of contract against the PA and its employees, or in negligence against it agents or contractors, is certainly not excluded. The provision excludes, only as to a breach of contract action against the PA, claims of "eviction of the Lessee" and for "abatement of rental [or other] damages, consequential or otherwise."

Indeed, the interpretation urged by Citigroup has an additional flaw: it seeks to make the PA an indemnitor of any tenant, occupant, licensee, etc., on the 7WTC premises, completely apart from any negligence on its own part. Citigroup apparently argues that even if its fuel distribution system led directly to this collapse, the negligence of it and its contractors cannot be the basis for a suit damages by Con Ed against them; only PA can be held liable. Accordingly, they believe that the contract implies one of two absurd results: either Con Ed can only sue PA for damage to the Substation, and must "eat" any damage caused by anyone else (a lease provision that Citigroup apparently thinks the PA bargained for, without consideration), or, Con Ed can sue and hold the PA liable for damages caused to Con Ed by parties other than the PA (e.g. Citigroup and its co-defendants) and as to which the PA itself is not negligent. Either outcome would be ridiculous, and clearly beyond the contemplation of the lease agreement; the latter would also run afoul of General Obligations Law § 5-322.1 (McKinney's 2004) which prohibits an agreement purporting to hold one harmless as a result of its own negligence pertaining to the construction, alteration, repair or maintenance of a building.

Apart from the generally specious interpretation and logic Citigroup applies to the contract, principles of contractual interpretation dictate that Citigroup's wishful interpretation be rejected. Indeed, one need look no further than the cases cited by Citigroup to discern that the controlling legal principles dictate that Citigroup cannot add a new term to Con Ed's contract with the PA, much less benefit from it. In *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360 (2002), the Court of Appeals held that the term "effective cost of funds" was unambiguous, rejecting a borrower's interpretation that the cost of funds calculation should not include costs from other loan defaults. The Court, in holding that the borrower's urged

13

interpretation would remove the term "effective" as a modifier to the term "cost of funds," and could

therefore not be permitted, stated the longstanding rule:

> We have long adhered to the "sound rule in the construction of contracts, that
> where the language is clear, unequivocal and unambiguous, the contract is to
> be interpreted by its own language" (*Springsteen v. Samson*, 32 N.Y. 703, 706
> [1865] [citing *Rogers v. Kneeland*, 10 Wend. 218 (1833)] ). We recently
> reaffirmed this principle, noting that " 'when parties set down their agreement
> in a clear, complete document, their writing should as a rule be enforced
> according to its terms' " (*Reiss v. Financial Performance Corp.*, 97 N.Y.2d
> 195, 198, 738 N.Y.S.2d 658, 764 N.E.2d 958 [2001] [quoting *W.W.W. Assoc.
> v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639
> (1990)] ).

Similarly, in *Pink v. Am. Surety Co. of N.Y.*, 283 N.Y. 290, 28 N.E.2d 842 (1940),

a reinsurance agreement entitling the reinsurer to "salvage" was deemed unambiguous, and in the

absence of an express provision, did not permit an offset against that salvage. And in *AG Capital

Funding Partners L.P. v. State St. Bank and Trust Co.*, 10 A.D. 3d 293, 781 N.Y.S.2d 88 (1ˢᵗ Dep't

2004), the requirement in an indenture that, for an instrument to be effective a party must "deliver

to trustee" a statement, was not satisfied by anything short of actual delivery to the trustee, and was

not satisfied by leaving a copy of the statement with the underwriter at the closing. Thus, in those

cases, parties to a contract were not able to add an unwritten offset provision, or vary an express

delivery requirement. Here, Citigroup cannot add a bar against litigation, and create a class of third-

party beneficiaries, out of whole cloth.

Citigroup's argument that it is a third-party beneficiary of its imagined term barring

suit is equally without merit. Again, the cases it cites reveal the specious nature of the arguments.

Citigroup does not contend that the lease obliged Con Ed to perform any work for Citigroup, *See,

Finch, Pruyn & Co., Inc. v. M. Wilson Control Servs. Inc.*, 239 A.D.2d 814, 658 N.Y.S.2d 496 (3d

Dep't 1997) (site owner was a third-party beneficiary where of subcontract where subcontractor was

14

engaged to perform services at owner's facility, even though owner not named in contract, as facility

was identified), nor is Citigroup related to the PA in the manner of a member of an association, *See,*

*Assoc. Teachers of Huntington, Inc. v. Bd. Of Ed., Union Free Sch.*, 33 N.Y.2d 229, 351 N.Y.S.2d

670 (1973) (collective bargaining agreement between Board and Association was for the benefit of

associations members, teachers, such that they could enforce express provision entitling them to

sabbaticals), or an Employee Stock Ownership Plan to the stock-issuing company, *Allen v. The Katz*

*Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 (2d Cir. 1981) (release to company for

ERISA and common law fraud claims implicating purported misrepresentations prior to termination

agreement applied to Plan).

Indeed, Citigroup is not even a party in interest as to Con Ed's lease, as was Calpers

in *State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d

256 (2000), where it was held that Calpers, the known intended assignee of a loan, was not in privity

with, or beneficiary of, a retainer between the original loan underwriter and its law firm at the time

of the closing, and could therefore not maintain an action in legal malpractice.

Regardless of the fact that a structure which became 7WTC was generally

contemplated at the time of the lease, Citigroup cannot be a third-party beneficiary of the lease

because the lease contained no terms which could inure to the benefit of anyone but Con Ed and the

PA.

## POINT II.

### NEGLIGENCE PER SE IS A VIABLE CAUSE OF ACTION

The case law cited by Citigroup, standing for the proposition that negligence per se

"requires a violation of a statute of statewide applicability", is hardly unfamiliar. *Elliott v. City of*

*New York*, 724 N.Y.S.2d 397 (2001) recognizes that negligence per se can be based upon a local

15

enactment where that enactment "might be entitled to statutory treatment in tort cases." *Elliott, supra*, at 400-401. The record on this motion does not permit such a determination at this time, one way or the other.

As set forth in the report of Dr. Fred Mowrer, attached to the Declaration of Stanley W. Kallmann, and as set forth in the FEMA Report, Citigroup's fuel storage and distribution apparatus clearly involved the storage of fuel oil in quantities vastly in excess of those permitted by City ordinance, and distributed such fuel at pressures and in volume far in excess of that required. We would ask rhetorically:  **If** the theory of negligence per se, that a violation of a statute of statewide applicability constitutes, not just evidence of negligence but negligence itself, and **if** the basis for the theory is, as one supposes, that a defendant charged with negligence can be found "automatically" negligent only upon the basis of a violation of a such wide recognition that the defendant should he held automatically liable, then why should Citigroup not be held so liable?  The circumstances herein, of course, are novel, but there is absolutely no reason why, pending further development of the facts, the theory of negligence per se should not be viable against Citigroup.

## POINT III.

## PA'S EXERCISE OF REGULATORY AUTHORITY DOES NOT PRECLUDE NEGLIGENCE CLAIMS AGAINST CITIGROUP, AND THE PERMIT TO OCCUPY HAS NO RELEVANCE

It is undisputed that the sole authority for regulation pertaining to fire and safety at 7WTC, resides in the PA. N.Y. Unconsol. § 6612 (McKinney 2004), N.J. Stat. Ann. §§ 32:1-35.61 (West 2004), *People v. Rodriguez*, 115 Misc.2d 866, 454 N.Y.S.2d 796 (Crim. Ct. Queens County 1982) (fire department may not issue summons to hotel on PA property at JFK Airport).

However, invoking nothing more than *ipse dixit*, and ignoring countless cases which have been adjudicated in state and federal courts over the years since the PA was created, Citigroup leaps to the conclusion that there can be **no negligence claim against a PA tenant**, as PA's "judgment may not be superceded by a jury." If that means that juries shall neither draft regulations, conduct inspections, or issue permits, violations, citations and fines, then plaintiffs agree with Citigroup. However, the exercise of administrative authority for fire and safety by any city, state, federal or corporate entity does not establish a standard of care under tort or contract for fire damage. To take Citigroup's position literally, **no tenant of the PA can ever be sued as a result of a fire;** indeed no tenant of any structure as to which city regulations were followed or permits issued could be sued. That absurd position is not the law.

Citigroup's position, of course, ignores the principle that even one complying with appropriate laws, codes, and the like, may still be in breach of its duty of care, and therefore negligent. *See, e.g., Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002), which held that a "claim of compliance with the fire and building codes is not dispositive of plaintiffs' allegations based on common-law negligence principles [citations omitted]."

Similarly, Citigroup asserts a baseless argument that federal negligence law should apply here, notwithstanding this Court's holding that New York law applies to these claims. *In re September 11 Litigation, supra,* at 289.  None of the cases cited by Citigroup regarding federal questions concerning the interpretation and extent of interstate compacts is a basis to assert that this Court should not apply New York law to negligence claims among tenants of the PA. *See, Cuyler v. Adams,* 449 U.S. 433 (1981) (Interstate Agreement on Detainers presents a federal questions); *Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275 (1959) (Tennessee-Missouri Bridge Commission subject to liability under Jones Act); *Eastern Paralyzed Veterans Ass'n v. Camden,* 111 N.J. 389, 545 A.2d 127 (1988) (New Jersey may not unilaterally regulate bi-state agency, PATCO).

Citigroup's arguments on this issue are baseless and should be rejected out of hand.

## POINT IV.

### PLAINTIFFS' DAMAGES, ARISING FROM PAYMENT OF SUMS CERTAIN TO CON ED FOR PROPERTY DAMAGE, AND EXPENSES DULY INCURRED IN REPLACEMENT OF THAT TANGIBLE PROPERTY AND EQUIPMENT ARE NEITHER REMOTE NOR SPECULATIVE

Con Ed seeks recovery from Citigroup for property damage to its Substation and equipment resulting from the fire and ensuing catastrophic collapse of 7WTC. This results from payment of sums certain to Con Ed by the subrogees, as well as costs incurred by Con Ed in restoring electrical service to Manhattan as a result of the collapse of WTC7. The damage suffered and claimed by Con Ed naturally and logically flow from the destruction of Con Ed property and the import on its business. A major fire or collapse of the building was certain to lead to the damages now sought in this action. Given that Citigroup has never seen the plaintiffs' damages or proofs thereof, it is hard to imagine that Citigroup can conclude that the damages are remote or speculative.

18

Con Ed's quantum of damages sought suffers from none of the metaphysical problems of plaintiffs seen in the various cases cited by Citigroup. *See, Mehta v. N.Y. City Dep't of Consumer Affairs*, 162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990) (anticipated lost profits for new business were incapable of calculation, and therefore unrecoverable); *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131 (1986) (new business seeking 20 years' lost profits under breached contract for management of domed stadium too speculative, and not contemplated in contract); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919) (Cardozo, J.) (lost profits due to breach of contract to supply first-run movies, as opposed to second-run movies, too speculative given wide variance in movie quality and random factors, and incapable of calculation); *Hochberg v. N.Y. City Off-Track Betting Corp.*, 74 Misc.2d 471, 343 N.Y.S.2d 651 (Sup. Ct., N.Y. County 1973) *aff'd* 43 A.D.2d 910, 352 N.Y.S.2d 423 (1st Dep't 1974) (plaintiff cannot collect winnings for horses on which he did not bet); *Apollo Steel Corp. v. Melco Cranes, Inc.*, 202 A.D.2d 1049, 609 N.Y.S.2d 121 (4th Dep't 1994) (increase in insurance premiums leading to increased costs, lost bids, and lost profits too speculative).

It is certainly premature – and also wishful thinking – for Citigroup, **having neither sought nor received any discovery concerning damages**, and offering no proof of the nature of the purported speculative damages in its motion, to make conclusions about the nature of the damages, and Citigroup has not discharged its burden of proof so as to represent **anything** to this Court about the damages incurred by Con Ed.

## POINT V.

## ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING CAUSE ARE FOR A JURY, ESPECIALLY WHERE THE FACTS ARE IN DISPUTE; THERE ARE CLEARLY FACTUAL QUESTIONS AT THIS JUNCTURE.

Citigroup treads lightly, in its Brief, around and away from the seminal case of

*Derdiarian v. Felix Contracting Corp.*, 434 N.Y.S.2d 166 (1980). This case, relied upon by this

Court in *In Re September 11 Litigation, supra*, clearly establishes that:

> Given the unique nature of the inquiry in each case, **it is for the finder of fact to determine legal cause,** once the Court has been satisfied that a *prima facie* case has been established [citations omitted]. To carry the burden of proving a *prima facie* case, the plaintiff must generally show that the defendant's negligence was **a substantial cause** of the events which produced the injury. Plaintiff need not demonstrate that the precise manner in which the accident happened, or the extent of injuries, was foreseeable. (Emphasis added.)

*Derdiarian, supra*, 434 N.Y.S.2d at 169. Indeed, this Court held, relying on *Derdiarian*, that

> Large-scale fire was precisely the risk against which the WTC Defendants had a duty to guard and which they should have reasonably foreseen. I also decline at this stage to find that the acts of the terrorists qualify as "extraordinary" intervening cause.

*In Re September 11 Litigation, supra* at 302.

The idea that, ordinarily, questions of causation are left to a jury is hardly startling.

*See, Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2nd Cir. 1991); *Del Cid v. Beloit Corp.*, 901 F. Supp.

539 (E.D.N.Y. 1995). What **is** startling, in this case, however, is defendant's effort to secure a

dismissal of the Complaint prior to any discovery being undertaken, where defendant has not

submitted of an iota of **evidence,** by an expert or otherwise, to establish that one cause or another,

besides the alleged negligence of the defendant in designing or permitting the fuel oil systems at the

subject premises, was an intervening cause of the plaintiffs' losses. On this "record", the movant,

which bears the burden of establishing its entitlement to relief, demonstrating "beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief",

*Padevan v. United States*, 82 F.3d 23 (2nd Cir. 1996), (quoting from *Hughes v. Rowe*, 449 U.S. 5, 10

(1980)), has produced **nothing** for the Court to demonstrate an entitlement to a dismissal.

Beyond the foregoing, and as set forth in the FEMA report, the NIST report, and the

report of Dr. Fred Mowrer attached to the Declaration of Stanley W. Kallmann, there has been

demonstrated (even though plaintiffs need "prove" nothing when the defendant has failed *prima*

*facie* to establish an entitlement to relief) a good likelihood that, had the quantity of highly

pressurized fuel oil which Citigroup allowed to be in the building, at the location of the structural

trusses not been present, the building, despite catching fire, and even despite the inactivity of the fire

fighters, would nonetheless have not have collapsed, given the propensity of a fire involving

"ordinary combustibles" to burn itself out.

Unfortunately, what defendant neglects to address is the total absence of discovery

in this case, and hence the disability which the plaintiffs have in establishment of proximate cause,

defendant's fault, and other elements of their claims.  What is clear, however, from the Mowrer

report, is that defendant's alleged "intervening" causes may not have been so "intervening" at all,

and that the **sole** fault for this collapse, with its consequent destruction of plaintiffs' property, may

well be laid at the hands of Citigroup and its "world-class" professionals.  Buildings catch fire all

the time, and fires frequently spread.  What is unusual about this case, however, as set forth in the

Mowrer report, is that a building of Type I construction **collapsed** (on top of plaintiff Con Ed's

substation), unlike other modern steel frame structures, and it appears quite likely that the

pressurized recirculating fuel oil distribution systems installed and maintained by the defendant

Citigroup were at least a substantial factor in causing that collapse.

Indeed, as is noted in the Mowrer report as well, as to the supposedly unique event that the Fire Department chose not to combat this fire, skyscraper fires in Los Angeles in 1988 and Philadelphia in 1991 were also not fought due to prevailing conditions. The difference, of course, is that those fires burned themselves out and did not cause collapse of the buildings. This is consistent with the fact that buildings of Type I construction which catch fire are supposed to be designed to burn themselves out without structural collapse. This building, too, might not have collapsed had Citigroup exercised reasonable and obligatory foresight. Yet, without even a scintilla of scientific **evidence** for their assertions, defendant's counsel baldly asserts that this Court should find, **as a matter of law**, that the decision of the Fire Department not to combat the fires in 7WTC did, in fact, constitute an intervening act.

*The Lusitania*, 251 F. 715 (S.D.N.Y. 1918), relied upon by Citigroup, was a trial court decision apparently rendered after a jury trial. *The Lusitania*, further, was based upon the premise that an illegal third party act is automatically a superceding cause, always barring a plaintiff from recovery. This is no longer the law. *See, e.g., Bonsignore v. City of New York*, 683 F.2d 635 (2nd Cir. 1982), in which a jury's verdict premised upon a defendant's negligence in allowing a third party to shoot the plaintiff, was affirmed, notwithstanding assertions of intervening act. *See,* contra to *The Lusitania, Petition of the Kinsman Transit Co.*, 338 F.2d 708 (2nd Cir. 1964), *cert. denied* 380 U.S. 944 (1965). Same cannot be applicable to the case at hand where, at least based upon the preliminary Mowrer report, there is a good likelihood the building would not have collapsed in the first place without the defendant's negligence.

The 1962 decision of the Court of Appeals in *Rivera v. City of New York,* 227 N.Y.S.2d 676 (1962), while interesting, is diminished to virtual extinction by the fact that *Derdiarian v. Felix Contracting Corp., supra,* with its now-seminal discussion of intervening cause,

followed it by some eighteen years. Beyond the foregoing, it was premised on the Court's finding

that an unforeseeable intervening act had occurred. In the present case, of course, what occurred at

7WTC, was a fire, a very foreseeable event, and just that, even though the **cause** of the fire (*i.e.*, the

fire and ultimate collapse of the twin Towers) was unusual. Thus, Citigoup's effort to find legal

comfort in the unexpected nature of the terrorist attacks is entirely unavailing. As set forth in the

Mowrer report, the fire burned for hours, much longer than expected for a fire involving ordinary

end expected combustible contents of an office building, and likely due to the presence of

pressurized fuel oil. Fires of similar type have burned themselves out, despite the inability of a fire

department to secure access for the purpose of interdiction. The collapse of 7WTC was highly

unusual, and likely the result of the fuel oil. Especially seen in that light, the *Rivera* decision is

inapposite to the present case.

Similarly, Citigroup cannot find solace in other cases it cites. This case cannot be

dismissed on the basis that there are no allegations in the complaint of a breach of duty, as in *Harris*

*v. New York City Housing Auth.*, 187 A.D.2d 362, 589 N.Y.S.2d 883 (1st Dep't 1992) (claim against

building owner for negligent security dismissed, as no allegations of breach of duty in complaint),

or because Con Ed's injuries are of an entirely different character than might be foreseen as due to

risk of fire, as in *Martinez v. Lazaroff*, 48 N.Y.2d 819, 424 N.Y.S.2d 126 (1979) (landlord's failure

to supply hot water not proximately related to infant's burns caused by dropped pot of boiling water,

where water would not have been boiled had hot water been available in apartment).

The motion, at least at this juncture, it totally without basis. No case law supports

the extraordinary relief being sought by the defendant herein, especially on a "record" as vapid as

defendant has created here. It is the movant, not the claimant, which bears the burden of establishing

its entitlement to the relief sought, demonstrating "beyond doubt" that plaintiffs cannot establish any facts to support the relief sought, but this movant has not even facially made that effort.

## POINT VI.

## PLAINTIFFS' SUIT AGAINST CITIGROUP IS TIMELY.

In a case of negligent construction, the statute of limitations accrues, as to an owner or one otherwise **in privity** with a design or construction professional, at the time the project is completed and accepted and runs for 6 years under the breach of contract statute of limitations in CPLR 213 (McKinney 2004), because the genesis of the duty lies in contract. *Amedeo Hotels Ltd. Partnership v. Zwicker Elec. Co., Inc.*, 739 N.Y.S.2d 10 (1st Dep't 2002). In that case, an action alleging faulty workmanship against an electrical contractor by a successor owner, the expiration of the statute of limitations for breach of contract was determined to be six years from the date of completion.

The statute of limitations accrues, **as to a stranger to the contract**, i.e. one who neither contracts nor is a third-party beneficiary, under the negligence statute of limitation for property damage, CPLR 214(4), accrues on the date of the occurrence, here a collapse, and the injured party has three years thereafter to sue. Indeed, this is the holding in one of the cases cited by Citigroup, *Mark v. Eshkar*, 194 A.D.2d 356, 598 N.Y.S.2d 255 (1st Dep't 1993). There, the claim was that improper support of a party wall through the use of piers rather than a foundation, installed in 1984, caused structural cracks which manifested in 1989. The defendant engineer sought to dismiss the suit, claiming that it was time-barred under the three year negligence statute, arguing that the cause of action accrued when the piers were installed. The Court agreed that, as here, the appropriate statute was the three year negligence statute, but that, as to the adjacent property owner,

a stranger to the contract, the cause of action accrued when the structural cracks were apparent. Generally, the Court held,

> in actions for negligent construction, the statute begins to run when the structure collapses, or when the damage from the negligent construction otherwise becomes apparent.

Other cases cited by Citigroup are fact-specific, and have no application here. See, *Alamio v. Town of Rockland*, 302 A.D.2d 842, 755 N.Y.S.2d 754 (3rd Dep't 2003) (plaintiff admitted that property damage was apparent over three years before the negligence action was commenced); *Mandel v. Tiffany*, 263 A.D.2d 827, 693 N.Y.S.2d 759 (3rd Dep't 1999) (damage to property was "apparent" in 1984 when trees cut down, not in 1991 when landslide occurred). Citigroup surely cannot say that defects in its fuel distribution system were "apparent" to anyone on the street.

The cases cited by Citigroup truly stand for the proposition that any claim **Citigroup** might have against the design and construction defendants for breach of contract accrued upon completion and acceptance of the installation of the backup power fuel distribution system in 1990, and expired in 1996. It is clear that in this case, the cause of action accrued when 7WTC collapsed, and that this suit was timely.

**POINT VII.**

**CITIGROUP FAILS TO OFFER EVIDENCE AS TO WHICH DEFENDANTS ARE PURPORTEDLY IMPROPERLY NAMED, IF ANY**

Citigroup again neglects the nearly silent record it has created, and with which it seeks to discharge its burden of proof as movant, with respect to the various parties it asserts should be dismissed from this action. Were, for example, Citigroup Global Market Holdings Inc. to undertake, prior to the time in which a reply brief is due, to identify which corporate entities were parties to or beneficiaries of contracts concerning the design and construction of the backup power and appurtenant fuel distribution system, and the chain of succession of interest, through sworn evidence and documents, or otherwise undertake to acknowledge or deny those facts pleaded in the complaint **upon information and belief**, plaintiffs will voluntarily dismiss claims against the unnecessary parties.

Citigroup's claim that it is unaware of why it has been named in this action is belied by its lengthy brief herein and numerous submissions in the related cases. Therefore, it cannot argue that it is unclear why relief against it is sought, as was the claim in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (employment discrimination complaint "easily satisfies" rule 8(a) because it gives fair notice to the respondent of the basis for the claims). Should Citigroup need a reminder, reference is made to the Statement of Facts herein. However, should amendment of the complaint be necessary, plaintiffs seek leave accordingly.

Accordingly, Citgroup's interpretation of certain cases concerning corporate liability is not disputed. However, Citigroup must discharge its burden of proof if it seeks dismissal. *See Gates v. AOL Time Warner Inc.*, 2003 WL 21375367 (N.Y. Sup. Ct. N.Y. County May 15, 2003) (AOL Time Warner established that its only relationship to AOL was ownership through "affidavits

26

and SEC filings" submitted in support of motion to dismiss, thereby discharging burden of proof).

*Garcia v. Union Carbide Corp.*, 176 A.D.2d 219, 574 N.Y.S.2d 341 (1st Dep't 1991) (piercing the

corporate veil requires "alter ego" not just complete ownership) has no bearing on the case at hand.

## CONCLUSION

Defendant's motion is without basis.  Plaintiffs submit that they should be permitted to

pursue their claims, and respectfully request that the motion be denied.

Dated:  January 26, 2005
   New York, New York

       GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
       Attorneys for Plaintiffs

       By:  /s/ *STANLEY W. KALLMANN*
         Stanley W. Kallmann (SK5204)
         Michael S. Leavy (ML6150)